# KIRBY FOREST INDUSTRIES, INC. *v.*
# UNITED STATES

No. 82–1994.   Argued February 22, 1984—Decided May 21, 1984

2

■

*Joe G. Roady* argued the cause and filed briefs for petitioner.

*Harriet S. Shapiro* argued the cause for the United States. With her on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Assistant Attorney General Liotta, Raymond N. Zagone,* and *Jacques B. Gelin.**

JUSTICE MARSHALL delivered the opinion of the Court.

Title 40 U. S. C. § 257, in conjunction with Rule 71A of the Federal Rules of Civil Procedure, prescribes a procedure pursuant to which the United States may appropriate privately owned land by eminent domain. The central issue in this case is whether the manner in which the value of the land is determined and paid to its owner under that procedure comports with the requirement, embodied in the Fifth Amendment, that private property not be taken for public use without just compensation.

I

A

The United States customarily employs one of three methods when it appropriates private land for a public purpose. The most frequently used is the so-called "straight-condemnation" procedure prescribed in 40 U. S. C. § 257. Under that statute, an "officer of the Government" who is "authorized to procure real estate for the erection of a public building or for other public uses"[1] makes an application to the Attorney General who, within 30 days, must initiate condemnation proceedings. The form of those proceedings is

---

*\*Jerrold A. Fadem* and *Michael M. Berger* filed a brief for Laughlin Recreational Enterprises, Inc., as *amicus curiae* urging reversal.

[1] Such authorization generally is derived from some independent statute that vests the officer with the power of eminent domain but does not prescribe the manner in which that power should be exercised. See, *e. g.*, 16 U. S. C. § 404c–11.

governed by Federal Rule of Civil Procedure 71A.[2]   In brief, Rule 71A requires the filing in federal district court of a "complaint in condemnation," identifying the property and the interest therein that the United States wishes to take, followed by a trial—before a jury, judge, or specially appointed commission—of the question of how much compensation is due the owner of the land.   The practical effect of final judgment on the issue of just compensation is to give the Government an option to buy the property at the adjudicated price.   *Danforth* v. *United States*, 308 U. S. 271, 284 (1939). If the Government wishes to exercise that option, it tenders payment to the private owner, whereupon title and right to possession vest in the United States.   If the Government decides not to exercise its option, it can move for dismissal of the condemnation action.   *Ibid.;* see Fed. Rule Civ. Proc. 71A(i)(3).

A more expeditious procedure is prescribed by 40 U. S. C. § 258a.[3]   That statute empowers the Government, "at any time before judgment" in a condemnation suit, to file "a declaration of taking signed by the authority empowered by law to acquire the lands [in question], declaring that said lands are thereby taken for the use of the United States."   The Government is obliged, at the time of the filing, to deposit in the court, "to the use of the persons entitled thereto," an

---

[2] Suits under § 257 originally were required to "conform, as near as may be, to the practice, pleadings, forms and proceedings existing at the time in like causes in the courts of record of the State" in which the suits were instituted.   Act of Aug. 1, 1888, ch. 728, § 2, 25 Stat. 357.   The adoption in 1951 of Rule 71A capped an effort to establish a uniform set of procedures governing all federal condemnation actions.   See Advisory Committee's Notes on Rule 71A, Original Report, 28 U. S. C. App., p. 644.

[3] Section 258a was enacted in 1931, for the principal purpose of enabling the United States, when it wished, peremptorily to appropriate property on which public buildings were to be constructed, making it possible for the Government to begin improving the land, thereby stimulating employment during the Great Depression.   See H. R. Rep. No. 2086, 71st Cong., 3d Sess. (1930).

amount of money equal to the estimated value of the land.[4] Title and right to possession thereupon vest immediately in the United States. In subsequent judicial proceedings, the exact value of the land (on the date the declaration of taking was filed) is determined, and the owner is awarded the difference (if any) between the adjudicated value of the land and the amount already received by the owner, plus interest on that difference.

Finally, Congress occasionally exercises the power of eminent domain directly. For example, when Congress thinks that a tract of land that it wishes to preserve inviolate is threatened with imminent alteration, it sometimes enacts a statute appropriating the property immediately by "legislative taking" and setting up a special procedure for ascertaining, after the appropriation, the compensation due to the owners.[5]

In addition to these three statutory methods, the United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner. *E. g., United States* v. *Dickinson*, 331 U. S. 745, 747–749 (1947). In such a case, the owner has a right to bring an "inverse condemnation" suit to recover the value of the land on the date of the intrusion by the Government. *United States* v. *Dow*, 357 U. S. 17, 21–22 (1958).[6]

The Government's selection amongst and implementation of these various methods of acquiring property is governed,

---

[4] The owner is entitled to prompt distribution of the deposited funds. 40 U. S. C. § 258a; Fed. Rule Civ. Proc. 71A(j).

[5] See, *e. g.*, 16 U. S. C. § 79c(b) (vesting in the United States "all right, title, and interest" in the land encompassed by the Redwood National Park as of the date of the enactment of the statute).

[6] Such a suit is "inverse" because it is brought by the affected owner, not by the condemnor. *United States* v. *Clarke*, 445 U. S. 253, 257 (1980). The owner's right to bring such a suit derives from " 'the self-executing character of the constitutional provision with respect to condemnation. . . .' " *Ibid.* (quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972)).

to some extent, by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U. S. C. § 4601 *et seq.* That statute enjoins federal agencies, *inter alia*, to attempt to acquire property by negotiation rather than condemnation, and whenever possible not to take land by physical appropriation. §§ 4651(1), (4), (8). In addition, the statute requires a court with jurisdiction over a condemnation action that is dismissed or abandoned by the Government to award the landowner an amount that will reimburse him for "his reasonable costs, disbursements, and expenses" incurred in contesting the suit. § 4654(a).[7] The statute does not, however, regulate decisions by the Government whether to employ the "straight-condemnation" procedure prescribed in § 257 or the "declaration of taking" procedure embodied in § 258a.

### B

Petitioner, a manufacturer of forest products, owns substantial tracts of timberland in Texas. This case arises out of a protracted effort by the United States to appropriate 2,175.86 acres of that land.

In the mid-1960's, several studies were made of the desirability of establishing a national park or preserve to protect an area of relatively untrammeled wilderness in eastern Texas. One of those studies, conducted in 1967 by the National Park Service, recommended the creation of a 35,500-acre Big Thicket National Park. The Texas Forestry Association, of which petitioner is a member, endorsed that proposal and declared a voluntary moratorium on logging in the designated area. Since 1967, petitioner has observed that moratorium and has not cut any trees on its property lying within the area demarked by the Park Service.[8]

---

[7] We have held that the last-mentioned provision for the reimbursement of costs is a matter of legislative grace, not constitutional entitlement. *United States* v. *Bodcaw Co.*, 440 U. S. 202, 204 (1979) *(per curiam).*

[8] Testimony at trial by one of petitioner's officers suggested that, regardless of the existence of the moratorium, petitioner would not have cut

After seven years of desultory consideration of the matter, Congress rejected the Park Service proposal and enacted legislation creating a much larger Big Thicket National Preserve. Act of Oct. 11, 1974, Pub. L. 93–439, 88 Stat. 1254, 16 U. S. C. § 698 *et seq.* The statute directed the Secretary of the Interior to acquire the land within the boundaries of the Preserve. 16 U. S. C. § 698(c). The Senate Report made clear that, though the Secretary had the authority to acquire individual tracts by declaration of taking, pursuant to 40 U. S. C. § 258a, such a peremptory procedure should be employed only when necessary to protect a parcel from destruction. S. Rep. No. 93–875, p. 5 (1974). It was understood that, in the absence of such an emergency, the Secretary would purchase the land using the straight-condemnation method prescribed in 40 U. S. C. § 257.[9]

The Government initially attempted to acquire the acreage owned by petitioner through a negotiated purchase. On August 21, 1978, after those negotiations had broken down, the United States filed a complaint in condemnation in the District Court for the Eastern District of Texas. Shortly thereafter, the Government filed a notice of *lis pendens,* notifying the public of the institution of the condemnation proceeding. The District Court referred the matter to a special commission to ascertain the compensation due petitioner.

Trial before the commission began on March 6, 1979. On that day, the parties stipulated that "today is the date of taking." After hearing competing testimony pertaining to the fair market value of petitioner's land, the commission

---

any trees on that land, which it had held as a "reserve logging area" since the 1950's. Brief for United States 8, citing 1 Tr. 52. For the purpose of our decision, we place no weight on that testimony; we assume that petitioner voluntarily forwent an opportunity to make profitable use of its land.

[9] The House bill had contained a provision appropriating the land by a legislative taking. H. R. 11546, 93d Cong., 1st Sess., § 2 (1973). The Senate rejected this method on the ground that it was unnecessary to protect the land and would be unduly expensive. S. Rep. No. 93–875, pp. 5–6 (1974). The House acceded to the Senate's position.

entered a report recommending compensation in the amount of $2,331,202.

Both parties filed objections to the report in the District Court. On August 13, 1981, after holding a hearing to consider those objections, the District Court entered judgment awarding petitioner compensation in the amount recommended by the commission, plus interest at a rate of six percent for the period from August 21, 1978 (the date the complaint had been filed), to the date the Government deposited the adjudicated value of the land with the court. *United States* v. *2,175.86 Acres of Land*, 520 F. Supp. 75, 81 (1981). The court justified its award of interest on the ground that the institution of condemnation proceedings had "effectively denied [petitioner] economically viable use and enjoyment of its property" and therefore had constituted a taking. *Id.*, at 80.[10]  On March 26, 1982, the United States deposited the total amount of the judgment in the registry of the District Court. On the same date, the Government acquired title to the land.

Both parties appealed. A panel of the Court of Appeals for the Fifth Circuit unanimously ruled that the commission's report failed to meet the standards enunciated in *United States* v. *Merz*, 376 U. S. 192 (1964), and remanded the case for further findings regarding the value of petitioner's land. *United States* v. *2,175.86 Acres of Land*, 696 F. 2d 351, 358 (1983). More importantly for present purposes, the Court of Appeals, by a vote of two to one, reversed the District Court's award of interest to petitioner. Reasoning that "the mere commencement of straight condemnation proceedings, where the government does not enter into possession . . . , does not constitute a taking," *id.*, at 355, the court held that,

---

[10] The District Court did not expressly rule upon petitioner's contention that the stipulation entered into by the parties on the opening day of trial established the date of the taking. But, by awarding interest as of the date of the filing of the complaint, the court implicitly rejected petitioner's submission on that issue.

in this case, the date of the taking should be deemed the date on which the compensation award was paid.[11] Consequently, no interest was due on that award.[12]

We granted certiorari to resolve a conflict in the Circuits regarding the date on which the taking, in a "straight-condemnation" proceeding, should be deemed to occur and the constitutional obligation of the United States to pay interest on the adjudicated value of the property.[13] 464 U. S. 913 (1983). We now affirm.

## II

The United States has the authority to take private property for public use by eminent domain, *Kohl* v. *United States*, 91 U. S. 367, 371 (1876), but is obliged by the Fifth Amendment to provide "just compensation" to the owner thereof.

---

[11] The Court of Appeals agreed with the District Court that the parties' stipulation regarding the "date of taking" was not controlling, see n. 10, *supra*. After reviewing the record, the Court of Appeals determined that the stipulation pertained only to the date as of which the land was to be valued, not the date on which the Government was deemed to have appropriated the land. 696 F. 2d, at 356. We see no reason to question that determination.

[12] Judge Jolly dissented on this issue, arguing that the owner of unimproved land subject to condemnation proceedings under 40 U. S. C. § 257 is entitled to interest on the award at least for the period beginning with entry of judgment by the district court, because during that period the owner is "shackled from making economically viable use of his property." 696 F. 2d, at 358–359.

[13] In two cases, panels of the Court of Appeals for the Ninth Circuit have rejected the position taken by the Fifth Circuit in this case, holding that, when the United States condemns unimproved property using the method prescribed in 40 U. S. C. § 257, it must award interest to the owner for some period prior to the date the award is paid and title passes. *United States* v. *15.65 Acres of Land*, 689 F. 2d 1329 (1982), cert. denied *sub nom. Marin Ridgeland Co.* v. *United States*, 460 U. S. 1041 (1983); *United States* v. *156.81 Acres of Land*, 671 F. 2d 336, cert. denied, 459 U. S. 1086 (1982). Similar confusion exists in the District Courts. See, *e. g., United States* v. *59.29 Acres of Land*, 495 F. Supp. 212 (ED Tex. 1980) (date of taking is date of announcement of the award by the commission).

"Just compensation," we have held, means in most cases the fair market value of the property on the date it is appropriated. *United States* v. *564.54 Acres of Land*, 441 U. S. 506, 511–513 (1979).[14] "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Id.*, at 511 (quoting *United States* v. *Miller*, 317 U. S. 369, 374 (1943)).[15]

If the Government pays the owner before or at the time the property is taken, no interest is due on the award. See *Danforth* v. *United States*, 308 U. S., at 284. Such a mode of compensation is not constitutionally mandated; the Fifth Amendment does not forbid the Government to take land and pay for it later. *Sweet* v. *Rechel*, 159 U. S. 380, 400–403 (1895). But if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.

---

[14] Other measures of "just compensation" are employed only "when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public. . . ." *United States* v. *Commodities Trading Corp.*, 339 U. S. 121, 123 (1950).

[15] We have acknowledged that, in some cases, this standard fails fully to indemnify the owner for his loss. Particularly when property has some special value to its owner because of its adaptability to his particular use, the fair-market-value measure does not make the owner whole. *United States* v. *564.54 Acres of Land*, 441 U. S. 506, 511–512 (1979). We are willing to tolerate such occasional inequity because of the difficulty of assessing the value an individual places upon a particular piece of property and because of the need for a clear, easily administrable rule governing the measure of "just compensation." *Ibid.*

None of the discussion in this opinion is intended to modify either the manner in which the fair-market-value standard is interpreted and applied or the test for determining when the fair-market-value standard must be supplanted by other formulae, see n. 14, *supra*. In particular, we express no view on the question of how the value of land condemned under 40 U. S. C. § 257 should be assessed when activities of the Government during the pendency of the condemnation proceedings have so altered the condition of the property as to reduce the price it could fetch on the open market on the date of the taking.

*Phelps* v. *United States*, 274 U. S. 341, 344 (1927); *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299, 306 (1923).[16]

From the foregoing it should be apparent that identification of the time a taking of a tract of land occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled. The Government contends that, in straight-condemnation proceedings like that at issue here, the date of taking must be deemed the date the United States tenders payment to the owner of the land. The Government's position is amply supported by prior decisions by this Court and by indications of congressional intent derivable from the structure of the pertinent statutory scheme and the governing procedural rule.

In *Danforth* v. *United States, supra,* we were called upon to determine the date on which the Government, in an exercise of its eminent domain power under the Flood Control Act of 1928, ch. 569, 45 Stat. 534, as amended, 33 U. S. C. § 702a *et seq.,* appropriated the petitioner's property. We held that, "[u]nless a taking has occurred previously in actuality or by a statutory provision . . . , we are of the view that the taking in a condemnation suit under this statute takes place upon the payment of the money award by the condemnor." 308 U. S., at 284.[17] In response to the contention

---

[16] The last-mentioned principle underlies the provision in 40 U. S. C. § 258a for the payment of interest on any difference between the estimated value of land appropriated through a declaration of taking and its subsequently adjudicated actual value as of that date. See *supra,* at 5. The principle also underlies several decisions by Courts of Appeals, holding that the six percent rate of interest prescribed by § 258a is not a ceiling on the amount that can and must be paid by the Government. See, *e. g., United States* v. *329.73 Acres of Land,* 704 F. 2d 800, 812, and n. 18 (CA5 1983) (en banc). The United States has acquiesced in those decisions. Brief for United States 14, n. 13.

[17] Petitioner's contention that our decision in *Danforth* pertained only to takings effected pursuant to the Flood Control Act is unpersuasive. Though the Flood Control Act contained a provision (analogous to 40 U. S. C. § 258a) empowering the United States to appropriate land expeditiously by filing a special petition and depositing an estimated award,

that such a procedure was unfair, we observed, " '[t]he owner is protected by the rule that title does not pass until compensation has been ascertained and paid . . . .' " *Id.*, at 284–285 (quoting *Albert Hanson Lumber Co.* v. *United States,* 261 U. S. 581, 587 (1923)).

That all straight-condemnation proceedings under § 257 should operate in the fashion described in *Danforth* is strongly suggested by the structure of Rule 71A, which now governs the administration of the statute. Rule 71A(i) permits the United States to dismiss a condemnation suit at any time before "compensation has been determined and paid," unless the Government previously has "acquired the title or a lesser interest . . . or taken possession."[18] The Government's capacity to withdraw from the proceeding in this fashion would be difficult to explain if a taking were effectuated prior to tendering of payment.

Finally, Congress' understanding that a taking does not occur until the termination of condemnation proceedings brought under § 257 is reflected in its adoption of § 258a for the purpose of affording the Government the option of peremptorily appropriating land prior to final judgment, thereby permitting immediate occupancy and improvement of the property.[19] Such an option would have been superfluous if, as

---

ch. 569, § 4, 45 Stat. 536 (incorporating by reference § 5 of the River and Harbor Act of 1918, ch. 155, 40 Stat. 911), when the Government appropriated the land at issue in *Danforth*, it apparently did not invoke its special statutory authority but instead took the property in the usual fashion as authorized by 40 U. S. C. § 257. The holding of the case is thus on point.

[18] After commencement of the valuation hearing, the Government may dismiss the suit only pursuant to a stipulation with the owner, Fed. Rule Civ. Proc. 71A(i)(2), or with the approval of the district court, Fed. Rule Civ. Proc. 71A(i)(3). The Rule does not suggest that a court order dismissing a suit has the effect of nullifying a taking that has already occurred. Indeed, to the contrary, the Rule forbids the district court to dismiss an action (without awarding just compensation) if the Government has acquired any "interest" in the property. *Ibid.*

[19] See n. 3, *supra.*

petitioner contends, a taking occurred upon the filing of the complaint in a § 257 suit.[20]

Petitioner's principal objection to the position advocated by the Government is that such a reading of § 257 and Rule 71A is precluded by the Fifth Amendment. Petitioner contends that, at least when the subject of a straight-condemnation proceeding is unimproved land, the owner is effectively deprived of all of the significant interests associated with ownership long before the Government tenders payment. The filing of a complaint in condemnation and a notice of *lis pendens*, petitioner contends, has the effect of preventing the owner of unimproved land thereafter from making any profitable use of it, or of selling it to another private party. At the same time, the owner remains liable for property taxes.[21] Such a thoroughgoing abrogation of the owner's rights, petitioner submits, surely constitutes a taking as soon as the abrogation is effective, regardless of when the land is officially appropriated under the terms of the statute.

If petitioner's depiction of the impairment of its beneficial interests during the pendency of the condemnation suit were

---

[20] It must be admitted that the adoption of § 258a does not compel the conclusion that Congress in 1931 understood that the taking in a § 257 suit did not occur until the date payment was tendered by the condemnor, because § 258a by its terms only empowers the Government to file a declaration of taking prior to "judgment." The language of § 258a is thus consistent with a congressional understanding that the taking occurred upon entry of final judgment in a straight-condemnation action. However, the fact that Congress did not empower the Government to file a declaration of taking anytime prior to the tender of payment does not undercut our construction of §257, because the Government has no need of special authority to appropriate land after judgment and before payment in a straight-condemnation suit; after entry of judgment, the Government can acquire the land merely by paying the owner the adjudicated value of the property.

[21] Cf. *United States* v. *15.65 Acres of Land*, 689 F. 2d, at 1334 (arguing that the initiation of a condemnation action leaves "[t]he owner of unimproved land . . . with the liabilities which follow title but none of the benefits, save the right ultimately to be paid for the taking").

accurate, we would find its constitutional argument compelling.    We have frequently recognized that a radical curtailment of a landowner's freedom to make use of or ability to derive income from his land may give rise to a taking within the meaning of the Fifth Amendment, even if the Government has not physically intruded upon the premises or acquired a legal interest in the property.    Thus, we have acknowledged that a taking would be effected by a zoning ordinance that deprived "an owner [of] economically viable use of his land."   *Agins* v. *Tiburon,* 447 U. S. 255, 260 (1980).    And we have suggested that, under some circumstances, a land-use regulation that severely interfered with an owner's "distinct investment-backed expectations" might precipitate a taking.    *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 124 (1978).    The principle that underlies this doctrine is that, while most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of "'the advantage of living and doing business in a civilized community,'"[22] some are so substantial and unforseeable, and can so easily be identified and redistributed, that "justice and fairness" require that they be borne by the public as a whole.[23]    These considerations are as applicable to the problem of determining *when* in a condemnation proceeding the taking occurs as they are to the problem of ascertaining *whether* a taking has been effected by a putative exercise of the police power.

However, we do not find, prior to the payment of the condemnation award in this case, an interference with petition-

---

[22] *Andrus* v. *Allard,* 444 U. S. 51, 67 (1979) (quoting *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 422 (1922) (Brandeis, J., dissenting)).

[23] See *Agins* v. *Tiburon,* 447 U. S. 255, 260–262 (1980); *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 123–128 (1978); *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960); *Pennsylvania Coal Co.* v. *Mahon, supra,* at 413, 415–416; Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1214–1224 (1967).

er's property interests severe enough to give rise to a taking under the foregoing theory. Until title passed to the United States, petitioner was free to make whatever use it pleased of its property. The Government never forbade petitioner to cut the trees on the land or to develop the tract in some other way. Indeed, petitioner is unable to point to any statutory provision that would have authorized the Government to restrict petitioner's usage of the property prior to payment of the award.[24]

Nor did the Government abridge petitioner's right to sell the land if it wished. It is certainly possible, as petitioner contends, that the initiation of condemnation proceedings, publicized by the filing of a notice of *lis pendens*, reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. See, *e. g., Agins* v. *Tiburon, supra,* at 263, n. 9; *Danforth* v. *United States,* 308 U. S., at 285; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926). At least in the absence of an interference with an owner's legal right to dispose of his land,[25] even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment.

It is true that any effort by petitioner to develop the land probably would have prompted the Government to exercise its authority, under 40 U. S. C. § 258a, to file a declaration of

---

[24] The question of the Government's authority to dictate to petitioner the manner in which it could use the land is preeminently a question of law, not of fact. Thus, we find no merit in petitioner's contention that the Court of Appeals erred in not adhering to the strictures of Federal Rule of Civil Procedure 52(a) when examining the District Court's finding that the Government denied petitioner economically viable use of the land during the pendency of the suit.

[25] We have no occasion here to determine whether abrogation of an owner's right to sell real property, combined with a sufficiently substantial diminution of its utility to the owner, would give rise a taking. Cf. *Andrus* v. *Allard, supra,* at 66–68.

taking and thereby peremptorily to appropriate the tract in order to protect it from alteration. But the likelihood that the United States would have responded in that fashion to an attempt by petitioner to make productive use of the land weakens rather than strengthens petitioner's position, because it suggests that petitioner had the option, at any time, to precipitate an immediate taking of the land and to obtain compensation therefor as of that date, merely by informing the Government of its intention to cut down the trees.

We conclude, in sum, that petitioner has failed to demonstrate that its interests were impaired in any constitutionally significant way before the Government tendered payment and acquired title in the usual course.[26] Accordingly, we approve the finding of the Court of Appeals that the taking of petitioner's land occurred on March 26, 1982. Because the award was paid on that date, no interest was due thereon.

## III

The foregoing conclusion does not dispose of this case. We still must determine whether the award itself satisfied the strictures of the Fifth Amendment. As indicated above, petitioner is constitutionally entitled to the fair market value of its property on the date of the taking. See *supra*, at 10. Petitioner points out that $2,331,202 represents the commission's best estimate of the value of the land on March 6, 1979. To the extent that that figure is less than the value of the land on March 26, 1982, the date of the taking, petitioner contends, it has been denied just compensation.

The Government attempts to meet this objection by emphasizing the pragmatic constraints on determination of the value of real property. The Government contends that it is imperative that the trier of fact in a condemnation action be given a fixed date as of which the value of the land is to be assessed. At the time of trial, no one knows when the

---

[26] Had petitioner made such a showing, complex questions would have arisen regarding the measure of "just compensation." We defer resolution of those questions to a case in which they are fairly presented.

United States will exercise its option to purchase the property, so adoption of the date of payment as the date of valuation is infeasible. Moreover, prediction of the value of land at a future time is notoriously difficult. Under these circumstances, courts and commissions understandably have adopted the convention of using the date of the commencement of the trial as the date of the valuation.

The Government's argument provides a plausible explanation for the valuation procedure used in this case and other cases, but it does not meet petitioner's constitutional claim. However reasonable it may be to designate the date of trial as the date of valuation, if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the United States tenders payment, it violates the Fifth Amendment.

We are left with the problem of prescribing a solution to this difficulty. Petitioner suggests that we mandate an award of interest, at least for the period from the date of valuation to the date of the taking, as a rough proxy for the increase in the value of the land during that period. We decline the invitation. Change in the market value of particular tracts of land over time bears only a tenuous relationship to the market rate of interest. Some parcels appreciate at rates far in excess of the interest rate; others decline in value.[27] Thus, to require the Government to pay interest on the basis proposed by petitioner would only sometimes improve the fit between the value of condemned land on the date of its appropriation and the amount paid to the owner of such land.

Solution of the problem highlighted by petitioner requires, not a rule compelling payment of interest by the Government, but rather a procedure for modifying a condemnation

---

[27] For example, it appears that the market value of timberland of the sort owned by petitioner was much higher in March 1979 than in March 1982. See Vardaman's Green Sheet, Index of Pine Sawtimber Stumpage and Timberland Prices (Jan. 15, 1983), reprinted in App. to Brief for United States 1a.

award when there is a substantial delay between the date of valuation and the date the judgment is paid, during which time the value of the land changes materially. In the case before us, such a procedure is readily available. In view of the inadequacy of the commission's explanation for its valuation of petitioner's land, the Court of Appeals remanded for reconsideration of the value of the property. On remand, the District Court can easily adduce evidence pertaining to alteration in the value of petitioner's tract between March 6, 1979, and March 26, 1982.[28] In our view, such a reassessment is both necessary and sufficient to provide petitioner just compensation.

In other cases, such an option may not be available. However, the Federal Rules of Civil Procedure contain a procedural device that could do tolerable service in this cause. Rule 60(b) empowers a federal court, upon motion of a party, to withdraw or amend a final order for "any . . . reason justifying relief from the operation of the judgment." This provision seems to us expansive enough to encompass a motion, by the owner of condemned land, to amend a condemnation award. The evidence adduced in consideration of such a motion would be very limited. The parties would not be permitted to question the adjudicated value of the tract as of the date of its original valuation; they would be limited to the presentation of evidence and arguments on the issue of how the market value of the property altered between that date and the date on which the judgment was paid by the Government. So focused, the consideration of such a motion would be expeditious and relatively inexpensive for the

---

[28] Though the value of timberland of the kind contained in petitioner's tract seems to have declined during this period, see n. 27, *supra*, petitioner contends that the value of its parcel nevertheless increased because of the expansion of the residential areas surrounding nearby Beaumont, Tex., and the susceptibility of the parcel to rural subdivision or recreational usage. The District Court can and should assess these contentions on remand.

parties involved.[29]   Further refinement of this procedural option we leave to the courts called upon to administer it.[30]

## IV

For the reasons set forth above, we agree with the Court of Appeals that no interest was due on the condemnation award paid to petitioner.   Petitioner's meritorious contention that it is constitutionally entitled to the value of its land on the date of the taking, not on the date of the valuation, can be accommodated by allowing petitioner, on remand, to present evidence pertaining to change in the market value of the tract during the period between those two dates.   On the understanding that petitioner will be afforded that opportunity, the judgment is

*Affirmed.*

---

[29] The procedure would not be free, of course, but that fact may well have a healthy effect in deterring frivolous pleas for relief from final judgments. That he would be obliged to bear some litigation costs in contesting a Rule 60(b) motion should dissuade a landowner from filing such a motion unless he had good reason to believe that the value of his property changed materially between valuation and payment.

[30] We do not mean to suggest that the constitutional difficulty discussed in this section can be solved only by affording a condemnee in petitioner's position an opportunity to file a motion to amend the judgment under Rule 60(b).   Either Congress or a lower court might perceive a more easily administrable way of ensuring that the compensation paid to the owner of condemned land does not fall substantially below the fair market value of the property on the date of the taking.