177 P.3d 1198

**CITY OF SCOTTSDALE, a municipal corporation, Plaintiff–Appellee,**

v.

**CGP–ABERDEEN, L.L.C., an Arizona limited liability company, Defendant–Appellant.**

No. 1 CA–CV 07–0304.

Court of Appeals of Arizona, Division 1, Department A.

March 6, 2008.

Zeitlin & Zeitlin, P.C. By Dale S. Zeitlin, Phoenix, Attorneys for Appellant.

Office of the City Attorney, City of Scottsdale By Bruce Washburn, Deputy City Attorney, Scottsdale, Attorneys for Appellee.

Morrill & Aronson, P.L.C. By Martin A. Aronson, John T. Moshier, Scott D. Larmore, Phoenix, Attorneys for Amicus Curiae Arizona Public Service Company.

**OPINION**

SNOW, Judge.

¶ 1 CGP–Aberdeen, L.L.C. ("CGP") challenges the constitutional adequacy of the compensation it received for a fifty-acre parcel of real property that was condemned by the City of Scottsdale ("Scottsdale"). The United States Constitution requires that a property owner be paid just compensation in the amount of the value of the property as of the date it is taken from the owner. Arizona law values the property in a direct condemnation action as of the date of the summons initiating the condemnation action. Arizona Revised Statutes ("A.R.S.") section 12–1123(A) (2003). CGP argues that there was a substantial delay between Scottsdale's initiation of the condemnation action and the date on which Scottsdale took the property, during which time the value of the property increased substantially. CGP thus argues that due to this substantial delay and the resulting increase in property value, it did not receive the "just compensation" required by the United States Constitution.

¶ 2 In the circumstances presented here, we hold that the trial court should have determined the date on which Scottsdale "took" the property and, if that date is different than the date of the summons, whether the value of the property on that date was the same as its value on the date of the summons—and thus whether the statute, as applied, provided just compensation as required by the United States Constitution.

### FACTUAL AND PROCEDURAL HISTORY

¶ 3 Scottsdale is a municipal corporation authorized to acquire property in accordance with Arizona's direct condemnation statutes, A.R.S. §§ 12–1111 through –1129 (2003). Scottsdale condemned CGP's undeveloped parcel for inclusion in its McDowell Sonoran Preserve. Scottsdale filed a summons and complaint in condemnation on January 13, 2003. In a motion filed almost a year and a half later, on May 27, 2004, Scottsdale requested that the court enter an order for immediate possession. The order granting the motion was signed on July 15, 2004, and filed four days later. In accordance with A.R.S. § 12–1123(A), Scottsdale paid CGP four million dollars, its estimate of the property's value as of the date of the summons and complaint, to obtain immediate possession of the property.

¶ 4 CGP made a motion to require Scottsdale to pay the value the property possessed on the date of the order of immediate possession (July of 2004), which it contends is the date its property was taken, rather than on the date of the summons (January of 2003). The superior court denied the motion, stating that it believed it was bound by the statutory date of valuation.[1]

¶ 5 Because the parties agreed on the fair market value of the property on the date of the summons, the resolution of CGP's motion effectively eliminated the need for a valuation trial. Thus, as part of the final judgment, CGP and Scottsdale entered their "Stipulated Findings of Fact, Conclusions of Law and Judgment." The parties stipulated that, if it were not for the McDowell Sonoran Preserve for which the property was condemned, the property would otherwise be used for high-end residential development. The parties also stipulated that CGP "would be able to present evidence creating a triable issue of fact" supporting its assertion that "the property was significantly more valuable" in July of 2004 than it was in January of 2003. The stipulated judgment fixed the measure of compensation as the property's value on the date of the summons.[2] CGP preserved the right to appeal the constitutionality of the compensation contained in the judgment.

¶ 6 After dismissal of the case from the inactive calendar CGP filed an inverse condemnation action,[3] claiming that Scottsdale had taken its property without just compensation. Scottsdale thereupon moved to reinstate the direct action, and the motion was granted. The court later dismissed CGP's inverse condemnation action, and entered final judgment on March 9, 2007.

¶ 7 CGP timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003). During the course of this appeal, we granted Arizona Public Service Company ("APS") leave to file a brief as amicus curiae.

## ANALYSIS[4]

¶ 8 Under both the United States Constitution and the Arizona Constitution, property may not be taken unless just compensation is paid to the owner. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); Ariz. Const. art. 2, § 17 ("No private property shall be taken or damaged for public ... use without just compensation having first been made.").[5] "The purpose of just compensation is to place the property owner in the position he or she would have occupied had no taking occurred." *State ex rel. Miller v. Filler*, 168 Ariz. 147, 149, 812 P.2d 620, 622 (1991).

¶ 9 Under Arizona's direct condemnation statute, "the right to compensation and damages shall be deemed to accrue at the date of the summons, and [a property's] actual value at that date shall be the measure of compensation and damages." A.R.S. § 12–1123(A). Here, however, there was an eighteen-month delay between the statutory valuation date and the date that the court granted Scottsdale possession of the property, and the parties agree that there is evidence that the

---

1. At times, the parties' stipulations refer to both January 13 and January 18 of 2003 as the date of the summons and the statutory date of valuation. Both parties most frequently use January 13, which is the date of the complaint, and so we assume those stipulations referring to January 18 were typographical errors. There is no evidence to suggest that the property's value changed between January 13 and January 18 of 2003.

2. The parties agreed that the property's value on the date of the summons (January 13, 2003) was $4.88 million. Thus, Scottsdale was ordered to pay the remaining $880,000 (plus interest) in the court's final order.

3. A "direct" or "straight" condemnation is one in which the condemning agency files an eminent domain complaint and is later granted possession of the property. An "inverse" condemnation, by contrast, is one in which the agency takes the property without filing a complaint, and it is the landowner who thereafter files suit to obtain just compensation.

4. "We review matters of law and mixed questions of law and fact de novo." *Alberta Sec. Comm'n v. Ryckman*, 200 Ariz. 540, 543, ¶ 10, 30 P.3d 121, 124 (App.2001).

5. "The Takings Clause of the Fifth Amendment [is] applicable to the States through the Fourteenth Amendment." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

property's value increased significantly during that time. Thus, this case presents the issue of whether the date of the summons is always the date of the taking in Arizona and, if not, whether the difference in dates requires a different amount of compensation.

## I. Constitutional Principles

■ ¶ 10 Under the United States Constitution, a landowner whose property has been taken through eminent domain must receive as compensation the amount his property was worth on the date the property was taken. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 16, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) ("[P]etitioner is constitutionally entitled to the fair market value of its property on the date of the taking."); *see also id.* at 10, 104 S.Ct. 2187 (" 'Just compensation,' we have held, means in most cases the fair market value of the property on the date it is appropriated.");[6] *id.* at 11, 104 S.Ct. 2187 ("[I]dentification of the time a taking ... occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled."). Likewise, the Arizona Supreme Court has held that the same is true under the Arizona Constitution. *Calmat of Arizona v. State ex rel. Miller*, 176 Ariz. 190, 195, 859 P.2d 1323, 1328 (1993) ("The spirit and purpose behind the law of eminent domain mandates that the property be valued as of the date of the taking."). Other courts have reached the same conclusion in light of *Kirby. See Sara-*

*toga Fire Prot. Dist. v. Hackett*, 97 Cal. App.4th 895, 118 Cal.Rptr.2d 696, 702 (2002) ("[A]ny substantial increase in fair market value between the dates of valuation and taking must be paid in order to provide just compensation.") (internal quotations omitted); *Bd. of Comm'rs of New Orleans Exhibition Hall Authority v. Missouri Pac. R.R. Co.*, 625 So.2d 1070, 1080 (La.Ct.App.1993) ("[I]f the property has increased (or decreased[7]) in value between the time the expropriation suit was filed and the time of the taking, the property owner is entitled to receive the fair market value of the property at the time of the taking.").[8]

¶ 11 The issue presented in *Kirby* was whether the federal direct condemnation statute (40 U.S.C. § 257, recodified at 40 U.S.C. § 3113 (2002)), which is analogous to Arizona's direct condemnation statutes, provided just compensation. *See* 467 U.S. at 3, 104 S.Ct. 2187. In that case, the federal government instituted a direct condemnation action for several thousand acres of land. *Id.* at 7, 104 S.Ct. 2187. The government filed its complaint in August of 1978, and the trial as to the value of the land began in March of 1979. *Id.* The parties stipulated that the date of the taking of the land would be the first day of the valuation trial. *Id.* The judgment was not entered, however, until more than two years later, in August of 1981. *Id.* at 8, 104 S.Ct. 2187. In its judgment, the district court awarded interest on the property's de-

---

**6.** When the *Kirby* Court says "in most cases," it is qualifying the use of the fair market value measure, not the date. This is explained in the Court's footnote to that sentence, which states that "[o]ther measures of 'just compensation' are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.' " *Kirby*, 467 U.S. at 10 n. 14, 104 S.Ct. 2187 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950)).

**7.** Because this case only involves an increase in the subject property's value between the filing of the summons and the date of the taking, we need not decide whether the date of valuation specified by the statute would be constitutional in a declining real estate market.

**8.** Amicus APS argues that the Legislature may choose any reasonable date on which to value

property taken through eminent domain, referring to the supreme court's statement in *Desert Waters, Inc. v. Superior Court (City of Tucson)*, 91 Ariz. 163, 173, 370 P.2d 652, 659 (1962), that "the legislature may establish some convenient time[] as of which the value of the property will be assessed and the amount of compensation fixed." APS also relies on our interpretation of that statement in *Flood Control Dist. of Maricopa County v. Hing*, 147 Ariz. 292, 297, 709 P.2d 1351, 1356 (App.1985), in which we concluded that fixing the date of valuation as the date of the summons was appropriate, even if there was a "lengthy delay[] between the date of the summons and the actual taking." However, *Desert Waters* preceded both *Calmat* and *Kirby*, and *Hing* was likewise decided without the benefit of either case because it preceded *Calmat* and was on appeal at the same time as *Kirby*. Thus, these cases have been effectively overruled to the extent that they conflict with the rule that property must be valued as of the date it is taken.

termined value from the date the condemnation action was filed to the date compensation was paid. *Id.* The district court entered this award because it found that the institution of the condemnation action had effectively denied the landowner the "viable use and enjoyment of its property and therefore had constituted a taking." *Id.* (internal quotations omitted). The Fifth Circuit reversed the retroactive interest award, and the Supreme Court affirmed. *Id.* at 9, 104 S.Ct. 2187.

¶ 12 In so doing, however, the Supreme Court held that, regardless of when a condemnation action is instituted, a "petitioner is constitutionally entitled to the fair market value of its property on the date of the taking." *Id.* at 16, 104 S.Ct. 2187. The Supreme Court further determined that, under the federal direct condemnation statute, the date of the taking is the date the government tenders payment, not the date that the initial condemnation complaint was filed or the date on which the valuation trial began. *Id.* at 11–13, 104 S.Ct. 2187. It thus held that because the government was obligated to pay the value of the property as of the day it tendered payment, it would not suffice to pay the value of the property as of some earlier date together with interest thereon to the date of payment.[9] *Id.* at 17–18, 104 S.Ct. 2187.

¶ 13 The Supreme Court recognized the practical difficulty of estimating the value of property on the precise future date that the government would pay for it: "prediction of the value of land at a future time is notoriously difficult ... [and] courts and commissions understandably have adopted the convention of using the date of the commencement of the trial as the date of the valuation." *Id.* at 17, 104 S.Ct. 2187. However, the Court did not accept that such pragmatic constraints could excuse a constitutional defect:

However reasonable it may be to designate the date of trial as the date of valuation, if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the United States tenders payment, it violates the Fifth Amendment.

*Id.* The Court therefore affirmed the Court of Appeals' remand for a determination of the value of the property on the date of the taking.[10] *Id.* at 18, 104 S.Ct. 2187. *Kirby* thus established that, no matter how reasonable or pragmatic it is to select a precise statutory valuation date, just compensation requires the payment of the fair market value possessed by the property on the date of the taking.

¶ 14 Scottsdale, while acknowledging that just compensation must be paid as of the date of the taking, argues that the date of the summons serves as the date of the taking pursuant to Arizona statute. Scottsdale bases its argument on Arizona's condemnation statutes, *Calmat*, and *State ex rel. Willey v. Griggs*, 89 Ariz. 70, 71, 358 P.2d 174, 174 (1960), each of which we discuss in turn. We also find *Kirby's* discussion of the same issue under the analogous federal takings statute to be instructive, and on the basis of these authorities we reject Scottsdale's argument.

## A. Arizona's Condemnation Statutes

¶ 15 As Scottsdale points out, A.R.S. § 12–1123(A) specifies that the condemned property is to be valued as of the date of the summons initiating the action, and the owner is to be paid that amount. However, the statute does not specify that the date of the summons is the date of the taking for purposes of evaluating compliance with constitutional requirements, and the text of the statute demonstrates that, in fact, it is not.

¶ 16 First, the statutes refer to the property that is the subject of a condemnation complaint as the property "sought" to be taken, demonstrating that a taking does not

---

9. *Kirby* thus refutes Scottsdale's contention that "[i]f [CGP] suffered a constitutional deprivation by use of the statutory valuation date then the correct remedy is payment of interest from the date of the filing of the complaint."

10. The *Kirby* Court described a Rule 60 motion as another procedural device to be used for reassessment where remand may not be available. *See* 467 U.S. at 18–19, 104 S.Ct. 2187. Because remand for revaluation is an available option in this case, we need not discuss the propriety of using such a motion.

occur at the complaint's filing. *See* A.R.S. §§ 12–1117(5); 12–1116(H).

¶ 17 Second, the statute authorizes, but does not compel, the government to seek immediate possession of the property at the time that it files a condemnation action. *See* A.R.S. § 12–1116(E). If the State seeks immediate possession, the statute requires the court to value the property, and that tentative amount must be paid directly to the owner or a deposit or bond in that amount must be posted before the government may take possession. A.R.S. § 12–1116(H). The money or bond is held for the benefit of the owner, A.R.S. § 12–1116(I), and if the order for immediate possession is entered before the final judgment, interest will accrue on the compensation award "from the date the [possession] order is entered by the court." A.R.S. § 12–1123(B).

¶ 18 Third, Arizona's condemnation statutes do not prohibit a property owner from selling the property (subject to the condemnation notice) before entry of an order for immediate possession, nor do they relieve the owner of the burdens of ownership, such as liability, taxes, and insurance obligations, once the summons and complaint have been issued. *See generally* A.R.S. §§ 12–1111 through –1129. In fact, the condemnation statutes provide that the order of immediate possession, not the filing of the summons and complaint, is the trigger for changes in tax status. *See* A.R.S. § 12–1123(D). Scottsdale does not explain how, if the filing of a summons and complaint does constitute a taking, the property owner would still retain these burdens and benefits of ownership after the filing date. If Scottsdale were correct, a condemning agency could take possession of the subject property on the filing of a condemnation action without the need for such intermediate protections for the landowner, and the landowner would have no need to pay taxes on property it no longer owns.

¶ 19 Finally, the statutes envision that the government may eventually choose not to take the property and may voluntarily dismiss an action even after the complaint has been filed. *See* A.R.S. §§ 12–1116(A), (I); 12–1129(A). If the condemning agency has filed a bond to obtain possession "[t]he mon-

ey or bond may be held for ... all damages sustained by the defendant if for any cause the property is *not finally taken* for public use." A.R.S. § 12–1116(I) (emphasis added). For these reasons, the condemnation statutes do not envision that the mere institution of condemnation proceedings constitutes a taking.

**B.** *Calmat*

¶ 20 Scottsdale argues that *Calmat* establishes that "the initiating of a condemnation proceeding is presumptively going to be when the property owner is deprived of a significant portion of the value of his property[,] so that is when the property will be 'taken' in a constitutional sense...." In support of this argument, Scottsdale relies on *Calmat's* statement that "the commencement of the proceedings ... may be fairly said to represent the date of taking." 176 Ariz. at 194, 859 P.2d at 1327. *Calmat* merely indicated, however, that the summons date will ordinarily represent the taking date in those cases in which the condemning agency seeks to obtain immediate possession in an orderly fashion after the filing of its complaint. That is not what happened here.

¶ 21 In *Calmat,* the State filed a direct condemnation action in October of 1985 in order to widen a highway bridge. *Id.* at 191, 859 P.2d at 1324. Two months later, in December, the State posted a bond in the amount of its estimate of the value of the land and obtained an order for immediate possession. *Id.* After building structures on the land, the State failed to pursue the condemnation action to completion and the action was dismissed eleven months later, in November of 1986. *Id.* Seven months later, in June of 1987, Calmat filed an inverse condemnation action to obtain compensation for its property. *Id.*

¶ 22 Because the real estate market was rising over that period, Calmat argued that, pursuant to the direct condemnation statutes, specifically A.R.S. § 12–1123(A), its property should be valued on the date that it filed its inverse condemnation action rather than the earlier date on which the State had taken the property. *Id.* Further, Calmat argued that, pursuant to § 12–1123(B), it was entitled to

interest on the value its property possessed in June of 1987, running retroactively from December of 1985 (when the State took possession) to the date of payment. *Id.* at 192, 859 P.2d at 1325. In deciding the issue, our supreme court rejected Calmat's attempt to apply the direct condemnation statutes to inverse condemnation cases and, by so doing, reap a double benefit by valuing the property many months after the actual taking had occurred, and then granting retroactive interest on that higher value beginning from the date of the taking. The court thus determined that the proper time to value property in inverse condemnation actions is the date on which the government takes the property—in *Calmat,* December of 1985, "the date of the state's original entry." *Id.* at 192–95, 859 P.2d at 1325–28.

¶ 23 In the course of its analysis, the *Calmat* court observed that, in direct condemnation actions, the Legislature's decision to value condemned property on the date of the summons serves the purpose of placing "the property owner in the position he or she would have occupied had no taking occurred" because the date of the summons is usually "close in time to the actual taking." *Id.* at 193, 859 P.2d at 1326. This is so because the date of valuation set by the Legislature:

> [C]ontemplates an orderly taking of property whereby the condemning agency first files a complaint in condemnation and then seeks a court order to obtain immediate possession. The legislature's decision to value the property as of the summons' date in a direct condemnation action is logical because the commencement of the proceedings ... may be fairly said to represent the date of taking.

*Id.* at 193–94, 859 P.2d at 1326–27 (citations and internal quotations omitted). Thus, due to the presumed proximity between the date of the summons and the date the property is taken, the Legislature's designation of the date of the summons as the date of valuation in a direct condemnation proceeding does not ordinarily present constitutional problems.

¶ 24 The court then noted that this same presumption does not apply to inverse condemnations because of "the timing differences inherent between the two types of condemnation actions." *Id.* at 193, 859 P.2d at 1326. "Timing is critical to valuation," the court observed, and thus "[a] mechanical application of the valuation statute to an inverse condemnation action ignores the significant timing difference between direct and inverse condemnation actions." *Id.* at 194, 859 P.2d at 1327. According to *Calmat,* when the date the government actually takes possession of the property becomes too distant from the date of valuation it "affects the fairness of the ... property values" because it allows the "property values [to] fluctuate between the date of the condemnor's entry and the summons date." *Id.*

¶ 25 The *Calmat* court then determined that eighteen months (between the December 1985 order of possession and the summons in the June 1987 inverse condemnation action) was too long to presume that the property's value as of the date of its taking was fairly represented by its value on the date of the summons. *Id.* This case involves precisely the same amount of time between the summons and possession order, eighteen months, and *Calmat* concluded that such a delay required the property to be valued on the date the State took the property, not the summons date, with interest to run on that amount between the date of the taking and the time the State paid the landowner. *Id.* at 195–96, 859 P.2d at 1328–29.

¶ 26 *Calmat* makes clear that the commencement of the proceedings can, in most cases, be said to "represent" the date of the taking only because the *value* of the property on those two dates is usually the same and not because the *dates* are the same: "[t]he valuation statute fulfills this purpose [of providing just compensation] in a direct condemnation action *because the property is valued at a point close in time to the actual taking.*" *Id.* at 193, 859 P.2d at 1326 (emphasis added). We find no support in *Calmat* for the assertion that property is necessarily taken on the date of the summons in a direct condemnation proceeding.

¶ 27 Indeed, *Calmat's* factual disposition affirmatively demonstrates that the filing of a condemnation action does not, of itself, constitute a taking. After the dismissal of the direct condemnation action, and

upon Calmat's filing of the subsequent inverse condemnation action, the supreme court was obliged to determine the date of the State's original taking. The court did not select October of 1985, the date of the summons in the original direct condemnation action, as that date. Rather, it selected December of 1985, the date two months later when the government took possession of the property pursuant to the immediate possession order. *Id.* at 196, 859 P.2d at 1329. The *Calmat* court's identification of that date as the date of the taking demonstrates its determination that the mere initiation by the State of a direct condemnation action does not constitute a taking of property, but rather that it is the State's taking of possession pursuant to an order of immediate possession that constitutes the taking. *See also Kirby*, 467 U.S. at 14–15, 104 S.Ct. 2187 (holding that the mere initiation of condemnation proceedings does not constitute a taking under the federal direct condemnation statute).

### C. *Griggs*

¶ 28 Scottsdale also argues that *Griggs* compels the conclusion that, under state law, a taking occurs as soon as an eminent domain complaint is filed. We disagree. In *Griggs*, the State Highway Commission used a separate statute, A.R.S. § 18–155(D) (repealed 1974), to take the landowner's property, which was needed for a state highway. 89 Ariz. at 71–72, 358 P.2d at 174–75. Pursuant to the statute, the Commission could take property by first issuing a resolution establishing the necessity of doing so and then filing a condemnation complaint in the superior court. *See id.* at 72, 358 P.2d at 175. The statute specified that property owners would be paid the value of their land as of the date the resolution was issued, unless the complaint was not filed within two years of the resolution, in which case the property owners would be paid the value of their land as of the date of the summons. *Id.* The statute also specified that the Commission could dismiss the action before payment and pay nothing. *Id.*

¶ 29 The Commission in *Griggs* passed such a resolution in February of 1959, at which time the subject property had a value

of $21,000. *Id.* Six months later, when the State filed the condemnation action, the property had increased in value to $26,000. *Id.* Because the condemnation action was filed within two years, however, the statute specified that the landowners would be paid the earlier amount—$21,000—for their property. *Id.* The superior court nevertheless awarded the property owners the value of the land at the time the condemnation action was filed. *Id.* The State filed an appeal, noting that in awarding the landowners the greater value the superior court had failed to comply with the statute. *Id.* at 72–73, 358 P.2d at 175.

¶ 30 The supreme court affirmed, holding that the statute was unconstitutional because (among other reasons) the Commission had two years in which it could condemn the land without the landowner receiving any increase in value over the interim period. *See id.* at 76, 358 P.2d at 177. *Griggs* therefore held that it is not consonant with the requirements of the state constitution for a condemning agency to be able to freeze the value of property over time while determining when and whether it will take the property. Thus, *Griggs* actually undermines, rather than supports, Scottsdale's argument. Just as the State was prohibited from freezing the value of the Griggs' land by passing a resolution and waiting for up to two years to actually take possession of the land, Scottsdale is likewise prohibited from freezing the value of CGP's land by separating the date of the summons from the date that it actually takes the property.

¶ 31 Scottsdale argues that the mere filing of a complaint damages the property's value sufficient to constitute a taking. The *Griggs* court did also conclude that, from the date of a resolution passed under A.R.S. § 18–155(D), "the use to which the land can be put by its owner is restricted severely: its saleability is reduced, leasing is made less feasible, and improvements effectively prohibited." *Id.* at 73, 358 P.2d at 176. To the extent that *Griggs* relied on this reasoning as an independent basis for finding the statute unconstitutional, we find it inapplicable to this case for a number of reasons.

¶ 32 Both *Kirby* and *Calmat* were decided after *Griggs*. Those cases make clear that the Constitution requires that a landowner receive the value its property possessed on the date it was taken. Here, the parties have stipulated both that the property would be used for high-end residential development and that there is evidence that the value of the property increased after the date of the summons. In such circumstances, there is no evidence that the filing of the action ultimately reduced the value that CGP would receive for its land as of the date it was taken. Like the petitioner in *Kirby*, Scottsdale "is unable to point to any statutory provision that would have authorized the Government to restrict petitioner's usage of the property" in a way that would damage the accruing value CGP was ultimately entitled to receive for the property on the date of its taking. *See* 467 U.S. at 15, 104 S.Ct. 2187. Therefore, in this case, the mere institution of condemnation proceedings did not constitute a taking.

¶ 33 Further, *Griggs* does not hold that anytime a property's value is damaged the *entire* property is deemed taken. To the contrary, the *Griggs* court affirmed the superior court's determination that the property was to be valued as of the date of the summons, not the date of the resolution. *Id.* at 72, 76, 358 P.2d at 175, 178. Had the court concluded that the passage of the resolution constituted a full-fledged taking of the property, it would have been compelled to award the owner the value of the property as of that date.

¶ 34 And, nine years after *Griggs*, in *Weintraub v. Flood Control Dist. of Maricopa County*, 104 Ariz. 566, 571, 456 P.2d 936, 941 (1969), our supreme court rejected its reasoning in *Griggs* *sub silentio* and reached exactly the opposite conclusion: that the mere passage of an eminent domain resolution does not constitute a taking. Moreover, *Kirby* also rejected the assertion, in the context of the federal direct condemnation statute, that the filing of a complaint and a notice of lis pendens necessarily "has the effect of preventing the owner of unimproved land thereafter from making any profitable use of it, or of selling it to another private party"

sufficient to constitute a taking. 467 U.S. at 13, 104 S.Ct. 2187. The Kirby Court noted that "[i]f petitioner's depiction of the impairment of its beneficial interests during the pendency of the condemnation suit were accurate, we would find its constitutional argument compelling," *id.* at 13–14, 104 S.Ct. 2187, but ultimately concluded that the mere initiation of condemnation proceedings did not prevent the profitable use or sale of the subject property sufficient to constitute a taking. *Id.* at 14–15, 104 S.Ct. 2187.

¶ 35 Here, as in *Kirby*, there is no evidence that CGP could not use, develop, or sell the property after the complaint was filed, or that it had been relieved of the burdens of ownership. Nor is there any evidence that under the circumstances here the filing of the complaint alone deprived CGP of the value of its property sufficient to constitute a taking. Given the authority that the mere filing of a summons and complaint does not necessarily constitute a taking, and in the absence of any evidence that it did so here, we cannot conclude that a taking occurred on the statutory valuation date.

## II. Application

¶ 36 As *Calmat* establishes, in most cases the value of a condemned property on the statutory valuation date may be presumed to represent its value on the date of the taking because those dates are usually close in time. In such cases, the date of the summons establishes a practical and uniform date for valuation purposes that is presumptively reasonable. 176 Ariz. at 193–94, 859 P.2d at 1326–27. However, when the condemnee offers evidence of a gap in time between the summons date and the date of the taking during which the value of the property increased, the court must determine the date of the taking and whether the value of the property on that date is the same as the value provided for in the statute.

¶ 37 CGP has offered evidence that the taking occurred here with the entry of the possession order. While in certain circumstances a taking may be effected prior to an order of immediate possession, *see Kirby*, 467 U.S. at 13–14, 104 S.Ct. 2187, our supreme court has provided that a taking nonetheless

occurs when the order for immediate possession is entered. *Gardiner v. Henderson*, 103 Ariz. 420, 425, 443 P.2d 416, 421 (1968) ("While a taking may not be complete until after final judgment and vesting of title, a taking nevertheless commences with an order of immediate possession which permits the condemnor to enter the land, demolish the improvements, and commence the erection of public improvements."). In light of our rejection of Scottsdale's argument that a taking occurred when the summons and complaint were filed, the entry of the possession order would be the date of the taking if there were no evidence that the property was somehow taken before the order for immediate possession.

¶ 38 Because the parties have stipulated that there is evidence that the value of the property on the date of the immediate possession order was higher than its value on the date of the summons, the trial court should hear such evidence, decide the date of the taking, and determine the property's value as of that date.

¶ 39 Given the procedural posture below, however, Scottsdale was never given the opportunity to offer evidence that a taking occurred at some point after the filing of the complaint and prior to entry of the possession order. Scottsdale preserved its request for such an opportunity in its pleadings, but because the trial court felt bound to reject CGP's argument as a matter of law, it never reached this issue.[11] Therefore, on remand the trial court should determine both the date of the taking and the value of the property as of that date. We remand for these determinations.

### CONCLUSION

¶ 40 For the foregoing reasons, we vacate the judgment of the superior court and remand for further proceedings consistent with this opinion.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge, and PHILIP HALL, Judge.

---

11. We do not agree with Scottsdale's argument that CGP waived a determination of the date of the taking, for CGP explicitly asserted in the trial court that the date of the taking was the date of immediate possession and that Scottsdale was constitutionally required to pay the value of the property as of that date.