# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Public Building Comm'n v. Yellen*, 2013 IL App (1st) 112638

---

| | |
|---|---|
| Appellate Court Caption | PUBLIC BUILDING COMMISSION OF CHICAGO, Plaintiff, v. SHERWIN YELLEN, Defendant-Appellant (Nandorf, Inc., d/b/a Unique Thrift Store, Defendant-Appellee; Martin Yellen and Unknown Owners, Defendants). |
| District & No. | First District, Second Division<br>Docket No. 1-11-2638 |
| Filed | February 26, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant lessee was not entitled to any apportionment of the proceeds of plaintiff's condemnation action, since defendant's tenancy terminated prior to the date plaintiff deposited the compensation awarded for the condemned property and took title with the right to possession; therefore, the cause was remanded for the entry of an order remitting to the lessor the funds apportioned to the lessee. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-L-50176; the Hon. Alexander White, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

John F. Cloutier, of Chicago, for appellant.

John J. Foran, of Foran, O'Toole & Burke, LLC, of Chicago, for appellee.

Panel

JUSTICE SIMON delivered the judgment of the court, with opinion.

Justices Quinn and Connors concurred in the judgment and opinion.

## OPINION

¶ 1     On February 7, 2002, plaintiff, Public Building Commission of Chicago (PBC), filed a complaint for condemnation pursuant to the Public Building Commission Act (50 ILCS 20/1 *et seq.* (West 2002)) seeking title to real property located at 2329-43 South Kedzie Avenue, Chicago, Illinois. The property was owned by defendants Sherwin Yellen (Yellen) and Martin Yellen. Defendant Nandorf, Inc., d/b/a Unique Thrift Store (Nandorf), was named as a party claiming a leasehold interest in the property. Following a jury trial, the jury entered a verdict setting the compensation for the property at $1,950,000, plus interest. On May 16, 2007, the trial court entered a final judgment order based on this verdict.

¶ 2     On August 27, 2007, Nandorf moved for apportionment of the final just compensation award. On August 12, 2010, following an evidentiary hearing on the apportionment motion, the trial court entered a memorandum decision and judgment in favor of Nandorf, awarding $380,000 for its leasehold interest, $99,045.81 of reimbursement for gross rent paid to Yellen, and $6,500 to be paid to the appraiser for unpaid fees related to her report and testimony in the jury trial. Yellen filed a motion to reconsider, amend the pleadings and admit new evidence in which Yellen sought to reverse the trial court's order based upon the trial court's misapplication of the law. Yellen also sought to amend his pleading to include affirmative defenses and the admission of evidence of the May 7, 2009, judgment entered in favor of Nandorf in its negligence action against the demolition company that damaged the building occupied by Nandorf.

¶ 3     The trial court denied Yellen's motion and this appeal followed. Yellen asserts that the trial court erred in apportioning the condemnation award because: Nandorf did not have a leasehold interest in the property at the time of the taking; Nandorf was compensated for its damages in the separate negligence action it brought against the demolition company, thereby making the apportioned condemnation award to Nandorf an impermissible double recovery; the voluntary payment doctrine barred Nandorf's claimed entitlement to recover rent payments it made to Yellen; and Nandorf's claim is barred by the doctrine of *res judicata*. Yellen also argues that the trial court improperly awarded payment of fees for Nandorf's appraiser out of the condemnation award. For the following reasons, we reverse the judgment of the trial court and remand the matter for entry of an order that the condemnation award funds and payment of the $6,500 in fees to Nandorf's expert witness be disgorged and remitted in full and without offset to Yellen.

¶ 4                                    I. BACKGROUND

¶ 5        On May 13, 1992, Yellen and Nandorf entered into a five-year lease of the subject property, 2321-29 South Kedzie Avenue, Chicago, Illinois. The lease terms included a rent provision of $5,000 per month plus a *pro rata* share of real estate taxes and insurance. Two five-year lease extension options were also included. Nandorf operated a thrift store at the property and, in May 1997, exercised the first five-year option with a monthly rent of $5,600 plus a *pro rata* share of real estate taxes and insurance. The second five-year option was exercised by Nandorf's January 25, 2002, letter to Yellen extending the option term effective through May 2007 at a monthly rent of $6,200 plus a *pro rata* share of real estate taxes and insurance.

¶ 6        On February 7, 2002, the PBC filed the underlying eminent domain proceeding. Thereafter, Nandorf occupied the property and operated the thrift store. But, on January 14, 2004, the building occupied by Nandorf was damaged by a demolition contractor hired by the PBC to demolish an adjoining building. Nandorf continued to pay rent for a period of time, but was unable to occupy the building after it was damaged and ceased using the building for the operation of the thrift store. Following a jury trial, the trial court entered a final judgment order in the eminent domain proceeding, finding that just compensation for the property was $1,950,000, plus interest. On July 16, 2007, the PBC deposited the final award, plus interest, with the county treasurer.

¶ 7        On August 27, 2007, Nandorf filed its motion to apportion the award and an amended motion to apportion on May 20, 2008, which is at issue in this appeal. Attached as copies to the amended motion were the lease and letters relating to Nandorf's exercise of the earlier option periods. Included was its letter of January 25, 2002, in which Nandorf's general manager Otto A. Bonomo included a "request that two additional option periods of five years each at $6,800.00 and $7,400.00 per month respectively be added to the lease. Enclosed is that addendum. If this meets with your approval, please signature [*sic*] it and get it back to me." Yellen refused to accept that offer, as he did the other similar oral requests of Mr. Bonomo.

¶ 8        In its motion to apportion, Nandorf claimed that it was "entitled to the apportionment of the final just compensation award for its leasehold value for the unexpired term of its lease from January 14, 2004 until the expiration of the second option period on May 12, 2007." A briefing schedule was set for the motion. After briefs were submitted, an evidentiary hearing was held with testimony presented in November 2009 and January 2010.

¶ 9        At the apportionment hearing, Nandorf called Susan Enright, a commercial real estate appraiser, to testify as its expert on the valuation of the leasehold. Enright testified that she was originally contacted to appraise the leasehold value, but then was asked by counsel for Nandorf and counsel for Yellen to appraise the value of the whole property. In her testimony in the eminent domain proceeding, Enright stated that the market value of the entire property was $2,700,000. Enright also added that she was later contacted by Nandorf's counsel and asked to separately appraise the leasehold value.

¶ 10       Enright described her inspection of the property, interviews of real estate brokers and

appraisers, analysis of the lease and the market data from comparable properties and detailing the property and area. From this Enright determined that the market rent for the property was $12 per square foot. She then opined that the contract rent was below market value because the subject property lease rent at a monthly rate of $3.74 per square foot generated positive leasehold income of $8.26 per foot for a total value of $13,044 per month.

¶ 11 Enright stated that she then calculated total leasehold potential income by multiplying the monthly leasehold income by 40, the remaining number of months in the lease option period that commenced May 12, 2002, to come to a total of $521,760. She then applied a discount factor of 10% and did a present value calculation to come to her total market value of the leasehold interest of $379,372, which she rounded up to $380,000. On cross-examination, Enright testified that she did not enter into an engagement letter for her work in the eminent domain proceeding or for her work related to the apportionment hearing.

¶ 12 Otto Bonomo testified that he was an employee of Nandorf from November 1974 to July 2004 and continued on with the company as a member of the board of directors after his retirement. Bonomo stated that he was eventually promoted to the position of general manager of the company and was responsible for maintaining Nandorf's six thrift stores in continuous, good operating condition. Bonomo also spoke to the selection of the property as a location for a thrift store and his discussions with Yellen in reaching terms for the lease agreement in 1992.

¶ 13 Bonomo further testified that Yellen submitted a form lease and, in negotiating the lease terms, Nandorf included some changes as well as a rider. The parties signed the lease as modified and Nandorf later exercised the two five-year options in 1997 and 2002. Bonomo stated that, when Nandorf exercised the 2002 option, he also sent a letter to Babette Yellen seeking to include two more five-year renewal options in the lease. Yellen did not agree to that request. Bonomo testified that, at that time, Yellen had indicated that the city was interested in taking the property, but that he was going to do everything he could to prevent that from happening.

¶ 14 Bonomo recalled that Nandorf continued to operate a thrift store on the property until January 14, 2004, when the building was damaged by the demolition contractor. He spoke to Yellen on the date of the accident and was told that the building would be repaired as soon as possible. Bonomo also talked with Yellen and his insurance company on several occasions regarding the repair of the building. Based on reassurances that the building would be repaired, Nandorf continued to pay its monthly rent and *pro rata* share of real estate taxes and insurance through December 2004.

¶ 15 On cross-examination, Bonomo stated that he initially identified the subject property as a possible store location and conducted negotiations to rent the property. When he was given the form lease, it was forwarded to Nandorf's attorneys, who made alterations and drafted the rider. In particular, Bonomo testified that someone on behalf of Nandorf added the final sentence to paragraph 11 of the lease, which provides, in full:

"In case the Premises shall be rendered untenantable by fire, explosion or other casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time, or the building

-4-

containing the Premises shall have been wholly destroyed, the term hereby created shall cease and determine. If premises are being repaired rent abates for the portion not being used."

¶ 16    Bonomo testified that when Nandorf moved in, it had to repair the roof of the building to stop leaks, but considered that cost in determining to enter into the lease. At the end of the initial option period, when Nandorf wrote Yellen to exercise the second option period, it requested that two additional five-year option periods be included in the lease. Bonomo stated that Yellen did not accept the request. Bonomo said that Nandorf was able to remove cash registers the day after the demolition accident, but no one was permitted further access to the building because of its damaged, unsafe condition. Nandorf was eventually able to remove other items in 2007 before the PBC took possession.

¶ 17    Tammy Rose testified that she had been office manager for Nandorf since 1987. She was responsible for communicating with landlords, calculating amounts due to landlords, and supervising the issuance of checks. Pursuant to these duties, Rose communicated regularly with Yellen concerning the property. Rose confirmed that monthly rent checks were sent to Yellen through December 2004 and identified copies of those checks at trial that had been cleared after deposit by Yellen.

¶ 18    Rose also testified that, after Nandorf had stopped remitting rent payments, she had various conversations with Yellen concerning the property. In January 2005, she talked on the telephone with Yellen, who informed her that clothing was on the ground around Nandorf's donation box in the parking lot. Yellen told her that Nandorf had to pick up the clothes and plow the snow in the parking lot to avoid any lawsuits. After talking with Nandorf's general manager, David Vandenbosch, Rose sent Yellen a letter to inform him that Nandorf would remove the donation box, with the possibility of returning it in the spring.

¶ 19    Rose recounted that in September 2005, Yellen informed her that he saw that the building on the property was not properly closed off and said that Nandorf needed to provide board-up service so that the building would be secure. Rose sent Yellen a letter in response telling him that Nandorf would contact a company to board up the building. Yellen again contacted Rose in August 2006, this time using a handwritten fax note, to inform her that the receiving door at the property was open and needed to be secured.

¶ 20    David Vandenbosch testified that he was hired as an assistant general manager by Nandorf in the winter of 1999-2000 and became general manager in 2004 when Bonomo retired. Vandenbosch said that he and Bonomo were aware of the eminent domain complaint in February 2002, but exercised the five-year option on January 25, 2002, to maintain that option because they understood the condemnation proceeding could be abandoned at the will of the PBC. After being advised of the demolition accident, Nandorf continued to make payments on its lease because it had not received any notice that the rent was terminated and it wanted to reopen the store at that location based on its prior success. Furthermore, Yellen had informed Nandorf that he intended to repair the building. In addition, Vandenbosch testified that Yellen's insurance adjustor had contacted Nandorf about the damage to and repair of the building.

¶ 21    Vandenbosch further testified that he stopped the rent payments after approximately one

year because he had seen no progress in the repair of the building despite Yellen's assurances to Bonomo. Vandenbosch also believed the lease was still viable based on Yellen's continued contacts with Nandorf in 2005 and 2006 requesting that Nandorf take certain actions as tenant. Vandenbosch testified that Nandorf completed the tasks requested by Yellen because they considered the landlord-tenant relationship to still be in place.

¶ 22      When counsel for Yellen stated that he would not call any witnesses, Yellen was called to testify by Nandorf as an adverse witness. Yellen testified that Nandorf was a quality tenant that paid its bills on time and did not have any outstanding debts. Yellen said that he initially intended to have the building on the property repaired and contacted his insurance agent and construction people; however, as he investigated further, he realized that the repair would be more complicated than he originally believed and the insurance company never offered to provide enough funds to repair the building. Yellen admitted that he deposited all of the rent checks received from Nandorf, never gave any notice that the lease was terminated, and contacted Rose to request actions by Nandorf on several occasions in the three years following the demolition accident that damaged the building.

¶ 23      On August 12, 2010, the trial court issued a memorandum decision and judgment. The court awarded Nandorf $380,000 for its leasehold interest and $99,045.81 for reimbursement of gross rent paid after the date of the demolition accident. In addition, the court awarded $6,500 to Enright for unpaid fees for her work on the jury trial.

¶ 24      Yellen filed a motion for reconsideration, arguing that the judgment should be vacated. Yellen asserted that Nandorf did not have a leasehold interest on the date of the taking and, therefore, was not entitled to apportionment of the condemnation award. Asserting that the voluntary payment doctrine and double recovery rule precluded this award, Yellen also sought to reverse the award granting Nandorf recovery of rents paid. In addition, Yellen argued for reversal of the award to Enright because she was not a party to the action and had no standing. In addition, Yellen moved to introduce newly discovered evidence and amend his pleadings to conform to the evidence that Nandorf was compensated for damages in its tort action against the demolition company in a separate cause of action.

¶ 25      On August 29, 2011, the trial court entered a 24-page memorandum decision and order. The trial court's order is confusing at best, essentially copying the parties' arguments verbatim, each in the first person voice, and then providing conclusions that either contradict the court's findings or the court's ultimate orders. While the narrative of the trial court's order is favorably dispositive toward Yellen's position on the ultimate issue in this case, that the expiration of Nandorf's lease prior to the date of the taking bars the former lessee from receiving any portion of the condemnation award under *City of Lake Forest v. First National Bank of Lake Forest*, 52 Ill. App. 3d 893 (1977), it ultimately entered orders denying Yellen's motion in its entirety.

¶ 26      For example, in concluding its discussion of Yellen's first argument, the trial court stated:

> "The Court agrees with Nansdorf [*sic*]. Yellen argues in order for Nandorf to receive compensation from Yellen, in respect to the condemnation award, a leasehold must have existed at the time of the taking, and not at the date of valuation. Although the eminent

-6-

domain action was filed on February 7, 2002, for which Nandorf still had an unexpired lease, the actual taking did not take place until July 16, 2007[,] after the expiration of the lease on May 12, 2007. Nandorf does not dispute a leasehold did not exist at the time of actual taking, on June [*sic*] 16, 2007[,] when the condemnation award was paid, and admits *City of Lake Forest* stands for the proposition a lessee is not entitled to any portion of the condemnation award if the lease is cancelled. Although Nandorf did not 'cancel' the lease, there is no dispute the lease had terminated on May 12, 2007[,] which was between the date the petition to condemn was filed (February 2, 2002) and the date the compensation award was paid (July 16, 2007). Furthermore, there is no dispute Nandorf was paying rent beyond the expiration of the lease on May 12, 2007[,] and was deprived of his use of the leased premises after that date. Therefore, the lease did not expire on May 12, 2007[,] and Nandorf is entitled to a portion of the condemnation award."

¶ 27 With respect to Yellen's second argument, the trial court opined that it agreed with Yellen concerning the award granting the recovery of rent paid, stating "[t]he Court agrees with Yellin [*sic*]. There is no recovery of the rents paid." However, the trial court ordered the denial of Yellen's motion to reconsider and "[t]he motion to recover rents paid by Nandorf," despite the fact that Nandorf had not filed the latter motion. Finally, in the text of the order, the trial court agreed that Nandorf was standing in the appraiser's shoes in requesting the award and that it could not make such a request and the appraiser had no standing. Yet, in the next sentence, the trial court stated "[f]or the reasons stated above, Yellen's motions to reconsider the Decision and to vacate the judgment [are] denied." This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29 Under the government's power of eminent domain, private property may be taken for public purposes subject to the constitutional requirement of just compensation for the owner of the property. *Village of Bellwood v. American National Bank & Trust Co. of Chicago*, 2011 IL App (1st) 093115, ¶ 18. Condemnation of a defendant's property, and compensation for that property, is achieved via statutory process provided under the Eminent Domain Act (735 ILCS 5/7-100 *et seq.* (West 2002)) (Act). The first step of the process is the filing of a condemnation petition with the circuit court. The value of the property is the fair market value of the property on the date that the condemnation petition is filed, as determined by a jury under the condemnation process. *City of Lake Forest*, 52 Ill. App. 3d at 895. Title and the right of the government entity to occupy the property does not vest until this valuation process is complete and payment has been deposited. *Forest Preserve District v. First National Bank of Franklin Park*, 2011 IL 110759, ¶ 40.

¶ 30 Over the past century, when the taking actually occurs has been described by our supreme court as a "somewhat amorphous question." *Forest Preserve District v. West Suburban Bank*, 161 Ill. 2d 448, 455 (1994). That court held that, "in one sense, a taking occurs in the context of a condemnation proceeding at the time of filing the complaint," but noted "[t]hat is the point in time when the property is valued" and that "title acquired upon payment of just compensation relates back to the time of filing the complaint." *Id.* Therefore, the court

concluded that, "as a matter of legal fiction," the property owners "indeed suffered a taking" at the time of the complaint. *Id.*

¶ 31     This "amorphous question" was recently considered again by our supreme court in *Franklin Park*, 2011 IL 110759. The court definitively found "that a taking in Illinois for the purposes of applying *Kirby* [(*Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984))] occurs on the date that the government (1) deposits the amount of compensation that has been ascertained and awarded, *and* (2) acquires title and the right to possess the property." (Emphasis in original.) *Franklin Park*, 2011 IL 110759, ¶ 40. The court emphasized that prior rulings and comments placing the time of a taking as of the date of the filing of the petition for condemnation merely held that the date of filing was the date used for determining the value of the property and did not disturb these rulings on that issue. *Id.* ¶¶ 41-43.

¶ 32     The *Franklin Park* court further explained that, if a taking occurred any time prior to the payment of compensation and transfer of title, it would render the condemnation process unconstitutional. *Id.* ¶ 49. The court added that the government's ability to abandon a condemnation proceeding lends additional support to its conclusion because it would be illogical to allow the government to abandon the proceeding if the taking already occurred. *Id.* ¶ 59. This court recently followed this reasoning in permitting the government to abandon its petition, even after the parties had reached a settlement and agreed orders were entered because possession had not yet been taken. *Bellwood*, 2011 IL App (1st) 093115, ¶¶ 18-35.

¶ 33     As in the instant matter, the taking does not necessarily end proceedings. Where a party alleges an interest in the property, it may seek apportionment of the condemnation award by petition to the court after the plaintiff has taken possession. 735 ILCS 5/7-106 (West 2002). Tenants under a valid leasehold hold such a valid interest in the property to be classified as owners in the constitutional sense and are entitled to compensation. *Department of Public Works & Buildings v. Metropolitan Life Insurance Co.*, 42 Ill. App. 2d 378, 384 (1963). For valuation purposes, the fair market value is ascertained as of the date of the filing of the condemnation action and does not include " 'any element resulting subsequently to or because of the taking.' " *Metropolitan Life*, 42 Ill. App. 2d at 393-94 (quoting *Olson v. United States*, 292 U.S. 246, 256 (1934)).

¶ 34     In reviewing a condemnation action, evidentiary issues do not constitute reversible error when there is sufficient evidence provided by both sides and there is ample opportunity to review the conflicting evidence. *Department of Transportation v. Bolis*, 313 Ill. App. 3d 982, 985-86 (2000). However, purely legal questions are reviewed under a *de novo* standard of review. *Franklin Park*, 2011 IL 110759, ¶ 24. Likewise, the interpretation of the terms of a lease is a question of law, and where doubt or uncertainty exists as to the meaning of the language used in a lease, it should be construed against the lessor and in favor of the lessee to find the rational and probable agreement between the parties. *Sears, Roebuck & Co. v. Charwil Associates, Ltd. Partnership*, 371 Ill. App. 3d 1071, 1076 (2007).

¶ 35     Yellen argues that the trial court must be reversed in this case because the lease ended prior to the date of the taking and Nandorf held no leasehold interest at that time. Yellen refers to the language from *Franklin Park* to emphasize that there is no taking until

compensation has been paid and title has been acquired by the governmental entity. He asserts that, until that point, any party with an interest in the property is free to use it as if there was no condemnation action. Therefore, Yellen contends, the trial court erred in granting apportionment of the condemnation award because Nandorf's lease expired on May 12, 2007, and the taking occurred on July 16, 2007, at which time Nandorf had no interest in the property.

¶ 36 We agree. As Yellen noted during oral argument, the trial court appears to have confused the issues of a condemnation award and damages sounding in negligence for the demolition company's damaging the subject property. Without an interest in the property at the time of the taking, the inability of Nandorf to use and enjoy the property is irrelevant under the Eminent Domain Act and is, instead, an issue properly pursued under tort law. Nandorf brought a negligence action against the demolition company for the damage it caused that interrupted Nandorf's use of the building for its business and was successful in obtaining a favorable judgment that included payment to Nandorf of the bonus value of the expired leasehold interest as calculated by Enright and lost profits, thereby making it whole. Yellen correctly argues that it would be error to permit Nandorf to also receive an apportionment of the condemnation award, not only because it had no leasehold interest in the property at the time of taking, but also because Illinois courts have long recognized that a plaintiff may have only one satisfaction for an injury. *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 558 (1980).

¶ 37 As addressed above, regardless of whether Nandorf received any other award, the *Franklin Park* court clearly affirmed the long-standing principle of eminent domain jurisprudence that the date of the taking controls. The parties, including Nandorf, and the trial court all explicitly agree that the lease expired on May 12, 2007, and the taking occurred on July 16, 2007. This fact has been repeated throughout the trial proceedings, the trial court's order, and the parties' briefs and at oral argument. Accordingly, this court concludes that Nandorf had no leasehold interest on the date of the taking and no right to apportionment of the condemnation award and the trial court erred in apportioning the award.

¶ 38 Despite Nandorf's admission that the leasehold ended on May 12, 2007, it continued to advance arguments in an effort to support its conflated argument that the trial court mistakenly accepted. None of these arguments are supported by fact or case law, and they fail to overcome the clear delineation that the leasehold ended prior to the date of the taking. These arguments are all subsumed by the clear authority provided by the *Franklin Park* court and the line of cases before it, that the absence of a property right eclipses any right to any portion of the condemnation award to Nandorf.

¶ 39 In addition, Nandorf's assertions that it is entitled to the "fair cash rental value" of the leasehold minus the rental rate actually being paid or that an option to renew is also valued and there exists a presumption that a tenant will exercise its right to renew are not well taken. Nor is the now irrelevant, supposedly "uncontroverted testimony" of Nandorf's expert on the value of the lease, especially as it was merely as to the market value and not, as is required, the fair cash rental value. See *Department of Public Works & Buildings v. Bohne*, 415 Ill. 253 (1953). Furthermore, there was no option to renew the lease remaining that could even have triggered a right to condemnation proceeds.

¶ 40 Facing the bar imposed by *Franklin Park* on receiving an apportionment of the condemnation award in the absence of holding a property right, Nandorf, which, according to the record and statements made by counsel in oral argument, has been involved in prior condemnation actions, shifts its focus from the taking to the valuation of the leasehold. It contends, without authority, that "it is not the expiration of the lease which is controlling. Rather, it is the unexpired term of the lease due to the interruption by the damage event and protracted by Mr. Yellen's conduct which is controlling." Nandorf concludes that Yellen's actions precluded it from using and enjoying its leasehold and deriving the market value of the leasehold as of the date of valuation. Again, it is the termination of Nandorf's leasehold interest that is the cause of Nandorf being precluded from receiving an apportionment of the condemnation proceeds, not Yellen's conduct.

¶ 41 Nandorf next maintains that the trial court properly rejected Yellen's argument that the lease terminated due to the damage to the building because Yellen did not repair the building, did not provide any notice of termination of the lease, and continued to act as though Nandorf was his tenant. Disregarding its own acknowledgment that the lease terminated before the taking, Nandorf continues to claim it was a tenant after that date.

¶ 42 Reviewing the lease *de novo*, we look to paragraph 1l. It states, in pertinent part: "In case the Premises shall be rendered untenatable by *** casualty, Lessor may, at his option, terminate this lease or repair the Premises within sixty days. If Lessor does not repair the Premises within said time *** the term hereby created shall cease and determine." Testimony introduced by Nandorf merely recounts that Yellen would have liked to repair the building, had spoken to an insurance company and determined that the cost of repairing the collapsed roof and wall of the building was prohibitive. Yellen's decision not to attempt repairing the building is not subject to debate as paragraph 11 gives him sole discretion regarding repair of a casualty loss. Further, there is no conceivable way that the insurance proceeds, architectural work, contractor mobilization, ordering and receiving construction materials, obtaining necessary city permits and the completion of the extensive repairs could have been accomplished within 60 days. Also, there is nothing in the lease that required Yellen to give any notice of termination, and pursuant to paragraph 11, the termination was self-effectuating as the 60-day repair time limit had expired.

¶ 43 Nandorf also argues that Yellen's requests that Nandorf maintain or repair the property evidenced a continuing lessor-lessee relationship. As the building was in danger of further collapse, access to it was denied and it was boarded up. Not wanting to cease operations at the site, Nandorf kept a donation box adjacent to the building. Nandorf's brief and comments at oral argument described Yellen's requests that Nandorf keep the area around the donation box free of debris, clear away snow, board up and secure the building to prevent the theft of Nandorf's property in the building that could not be removed because of the unsafe condition of the building and, generally, to limit liability. These requests were characterized at oral argument as merely seeking the removal of an attractive nuisance at the property. But the requests in no way prove the existence of any ongoing tenancy relationship between Yellen and Nandorf after May 12, 2007, and Nandorf offers no legal support for such a result.

¶ 44 In its last gambit, Nandorf contends that by making repairs and maintaining the property as requested by Yellen, making rent payments after the demolition accident, and remaining

in possession of the property by leaving its property in the building, it acted as a holdover tenant. From this, Nandorf claims that it was treated as a holdover tenant on a year-to-year basis for the remainder of the lease until its expiration on May 12, 2007. As discussed above, Nandorf did not hold a leasehold interest in the property. It did not occupy the property or have possession of the property. Nandorf's business equipment and inventory were left in the building because of the extensive damage that collapsed the roof and wall of the building making it so dangerous that no one was permitted within it. In addition, performance of the maintenance and repairs requested by Yellen was acknowledged by Nandorf as necessary to avoid a public nuisance and limit liability.

¶ 45    In presenting these arguments, Nandorf does not provide citation to any supporting case law beyond general applications of the law of holdover tenancy or contract interpretation cases in its attempt to overcome the clear holding in *Franklin Park*. Nandorf cites *Bransky v. Schmidt Motor Sales, Inc.*, 222 Ill. App. 3d 1056 (1991), and *Hately v. Myers*, 96 Ill. App. 217 (1901), for the proposition that a commercial tenant who retains possession of the premises and maintains the payment of rent with the consent of the landlord establishes a year-to-year tenancy. However, neither of these cases involved a condemnation action and the facts in this case do not demonstrate that Nandorf met these elements for a holdover tenancy.

¶ 46    When a tenant maintains possession after the termination of a lease, "[a] holdover tenancy is created when a landlord elects to treat a tenant, after the expiration of his or her lease, as a tenant for another term upon the same provisions contained in the original lease. Only the lessor, not the lessee, has the right to decide whether to treat the lessee as a holdover tenant." *Roth v. Dillavou*, 359 Ill. App. 3d 1023, 1027 (2005). Nandorf made multiple oral and written requests that Yellen grant it two additional options to extend the lease for five years each. Yellen, in his discretion, rejected those requests and, as lessor, those denials are added support to the conclusion that no holdover tenancy was ever formed between Nandorf and Yellen.

¶ 47    Furthermore, Nandorf 's reading of paragraph 11 of the lease can in no way establish a holdover tenancy. The language of paragraph 11 clearly states that if the lessor did not repair the premises within 60 days of the damage accident, the "term hereby created shall cease and determine." If repairs were ongoing, the lease only provides for abatement of rent for the portion not being used during the time of repair. The arguments concerning the lease terms and the actions of the parties do not change the fact that no repair of the building occurred within 60 days of its damage, or the fact that no option to renew was ever granted by Yellen that extended the May 12, 2007, termination date. On this record, it is not possible for this court to conclude that Nandorf would renew its tenancy.

¶ 48    The value of the leasehold is of no import if that leasehold interest does not exist on the date of the taking. Without such a surviving interest, it also is of no import if a tenant lost its use and enjoyment of its property interest because of decisions related to the condemnation. Nandorf does not provide any case law on point to support its claim that the leasehold value survives. Instead it tries to conflate decisions that talk about the date for establishing value in condemnation proceedings or that generally discuss the discredited notion that Nandorf was a holdover tenant.

¶ 49 Nandorf was successful in conflating the date of the demolition damage with the date of the taking before the trial court, but we reject its arguments and reverse the judgment of the trial court in favor of Nandorf and order the entirety of the $380,000 awarded for the leasehold interest and the $99,045.81 reimbursement for gross rent paid be remitted to Yellen without offset. Contrary to Nandorf's argument, case law is clear that it is the expiration of the lease that is controlling, not the unexpired term or the actions of the parties. Nandorf admits and cannot escape the fact that it did not hold an interest in the property at the time of the taking and the trial court erred in granting Nandorf any apportionment of the condemnation award.

¶ 50 Additionally, we reverse the award of $6,500 granted to Enright as payment for her services related to the jury trial. Enright is not a party to the action and has no standing in this case. She is not an owner entitled to compensation under *Metropolitan Life*; she does not and cannot claim any valid interest in the property. There is nothing in the record that addresses imposing or shifting costs attributable to her work, nor is there anything that explains or supports the justification that she receive any portion of the condemnation award proceeds. Yellen notes, and Nandorf concedes, that in the trial court's August 29, 2011, memorandum decision and order, it agreed with Yellen. Nandorf claims that the trial court granted Yellen's motion on this issue. However, as Yellen argues, the trial court's order denied his motion to reconsider in full. The trial court clearly, and correctly, explicitly stated its agreement with Yellen's motion on this issue but, inexplicably, erred in completing its written order. This court can come to no other conclusion. Accordingly, the trial court's apportionment of the condemnation award is in error. We reverse the trial court's order and order any and all apportioned proceeds related to the taking be remitted to Yellen.

¶ 51                                    III. CONCLUSION

¶ 52 The judgment of the trial court is reversed and the matter is remanded for the trial court to order that the apportioned condemnation award funds of $380,000 for the leasehold interest, $99,045.81 reimbursement for gross rent paid, and $6,500 for fees to Enright be disgorged and remitted in full to Yellen without offset.

¶ 53 Reversed and remanded.