312 P.3d 1121

**CSA 13–101 LOOP, LLC, an Oklahoma limited liability company, Plaintiff/Appellant,**

**v.**

**LOOP 101, LLC, an Arizona limited liability company; Paul S. Anton and Valerie J. Christie, husband and wife; Oscar E. Swanky and Helen L. Swanky, as Co-Trustees of the Oscar E. Swanky and Helen L. Swanky Revocable Family Trust, Created July 19, 1997, as Amended, Defendants/Appellees.**

**No. 1 CA–CV 12–0167.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 10, 2013.

Bryan Cave, LLP by Sean K. McElenney, J. Alex Grimsley, Gregory B. Iannelli, Phoenix, Attorneys for Plaintiff/Appellant.

Fennemore Craig, PC by Timothy Berg, Louis D. Lopez, Phoenix, Attorneys for Defendants/Appellees.

## OPINION

HOWE, Judge.

¶ 1 This case requires this Court to decide, among other questions, whether a borrower or guarantor can contractually waive its right to a determination of fair market value in a deficiency action. Because we agree with the trial court that this right cannot be waived, and reject the other claims raised on appeal, we affirm the trial court's granting of summary judgment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Loop 101, LLC ("Loop 101") borrowed $15,600,000 from MidFirst Bank in February 2007 to build a commercial office building on its property adjacent to State Highway 101. Loop 101 gave MidFirst a promissory note secured by a deed of trust encumbering the property. Paul S. Anton and his wife, Valerie J. Christie, and Oscar Swanky and his wife, Helen Swanky (collectively, "the Guarantors") guaranteed the loan.

¶ 3 The promissory note and guaranty expressly stated that the Guarantors waived "the benefits of any statutory provision limiting the right of [Holder Lender] to recover a deficiency judgment ... after any foreclosure or trustee's sale of any security ... including without limitation the benefits, if any, ... of A.R.S. Section 33–814 [ (West 2013) ]." [1] Section 33–814 provides that the borrower in a deficiency action is entitled, upon request, to a hearing on the fair market value of the trust property at the date of the trustee's sale, and then to have that value deducted from the amount owed in determining the amount of the deficiency judgment. The deed of trust contained a similar albeit more specific provision that stated that the sales price at the trustee's sale was "conclusively deemed to constitute the fair market value" of the property, and that Loop 101 "hereby waive[ed] and relinquishe[d] any right to have the fair market value of the [property] determined by a judge ... in any action seeking a deficiency judgment ... including, without limitation, a hearing to determine fair market value" under A.R.S. § 33–814.

¶ 4 Loop 101 defaulted on the loan in June 2009, and MidFirst initiated non-judicial foreclosure proceedings under the deed of trust. On October 16, 2009, MidFirst assigned all of its rights under the loan, including the deed of trust, to CSA 13–101 Loop, LLC ("CSA") in an "intercompany loan transfer agreement." Later that day, CSA bought the office building at a trustee's sale for a credit bid of $6,150,000. At the time, $11,195,981.84 remained on the loan. CSA sued Loop 101 and the Guarantors for breach of the promissory note and guaranty and sought a deficiency judgment of $5,066,567.87 plus interest.

¶ 5 Loop 101 and the Guarantors counterclaimed against CSA and filed third-party claims against MidFirst for breach of the implied covenant of good faith and fair dealing by rejecting a proposed tenant and setting an "unreasonabl[y] low credit bid at the trustee's sale." CSA and MidFirst moved to dismiss these claims, interpreting them as claims that the property's price at the trustee's sale was below fair market value. They argued that a fair market value determination was not available because Loop 101 had not made a written application for one pursuant to § 33–814(A). They also argued that pursuant to the guaranty the Guarantors had waived any rights under this statute. They further argued that the claims against MidFirst were barred because the deed of trust waived all liability against MidFirst short of "gross negligence or willful misconduct." The Guarantors responded that the guaranty did not show a clear intent to waive a fair market value determination.

¶ 6 The trial court denied CSA and MidFirst's motion to dismiss, ruling that "[t]he parties cannot waive the rights protected by statute. The fair market value hearing will determine the value at the time of the sale." Loop 101 and the Guarantors then applied for a determination of the property's fair market value pursuant to § 33–814(A). The trial court held an evidentiary hearing and

1. We cite to the current version of applicable statutes when no revisions material to this decision have occurred.

found that the property's fair market value was $12,500,000.

¶ 7 CSA nevertheless moved for summary judgment on its claims for breaches of the contract and the guaranty. CSA argued that Loop 101 and the Guarantors had—through express language in the deed of trust and guaranty—"unequivocally waived their right[s] to have the [c]ourt's fair market value determination govern the amount of the loan deficiency." CSA and MidFirst also moved for summary judgment on Loop 101 and the Guarantor's counterclaims.

¶ 8 Loop 101 and the Guarantors responded that the summary judgment motion was an untimely motion for reconsideration of the trial court's prior ruling that statutory rights to a fair market value determination could not be waived. Loop 101 and the Guarantors also argued that they did not contractually waive their right to a fair market value determination because (1) the determination was a statutory right that could not be waived; (2) the loan agreement and promissory note did not contain a waiver clause against Loop 101; and (3) any such waiver was unconscionable. Loop 101 and the Guarantors further cross-moved for summary judgment, arguing that a deficiency did not exist because the office building's fair market value exceeded the amount of debt.[2]

¶ 9 In May 2011, the trial judge recused himself from the case, and the case was reassigned to a second judge. CSA moved to vacate all prior orders because the recusal created an "appearance of impropriety." The second judge denied the motion to vacate, finding that "nothing in the record suggests any impropriety," and that "[t]he temporal proximity between the announcement of [the judge's] retirement and his recusal strongly suggests the recusal was undertaken to aid the parties by accelerating the judicial reassignment process."

¶ 10 The trial court then denied CSA's motion for summary judgment as untimely because CSA raised issues that had been tried at the fair market value hearing. Because the property's fair market value exceeded the deficiency, the court found that no deficiency existed and granted Loop 101 and the Guarantors' cross-motions for summary judgment.

¶ 11 CSA timely appeals. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. § 12–2101(A)(1).

## DISCUSSION

### I. Enforceability of the Waiver Provisions

¶ 12 CSA first argues that the trial court erred in granting Loop 101 and the Guarantors summary judgment because they contractually waived their statutory rights to a judicial determination of the property's fair market value under § 33–814(A),[3] which had eliminated the deficiency. In reviewing a grant of summary judgment, we view the facts in a light most favorable to the party opposing the judgment. *See Hartford Accident & Indem. Co. v. Fed. Ins. Co.*, 172 Ariz. 104, 107, 834 P.2d 827, 830 (App.1992). "Our task is to determine whether a genuine issue of material fact for trial exists, and, if not, whether the trial court correctly applied the substantive law." *Aaron v. Fromkin*, 196 Ariz. 224, 227 ¶ 10, 994 P.2d 1039, 1042 (App. 2000).

¶ 13 The trial court did not err in ruling that Loop 101 and the Guarantors did not waive their right to a fair market value determination. "Waiver is the intentional relinquishment of a known right." *Verma v. Stuhr*, 223 Ariz. 144, 157 ¶ 68, 221 P.3d 23, 36 (App.2009). "It is well settled that most rights may be waived." *McClellan Mortg. Co. v. Storey*, 146 Ariz. 185, 188, 704 P.2d 826, 829 (App.1985). Indeed, "[s]tatutory

---

**2.** Because the fair market value exceeded the amount of the debt, Loop 101 and MidFirst stipulated to the dismissal of the counterclaims, and the court dismissed them with prejudice.

**3.** We reject Loop 101 and the Guarantors' contention that CSA waived this issue by failing to

raise this issue at trial. Because CSA argued in its pleadings that Loop 101 and the Guarantors had contractually waived any right to a fair market value determination under § 33–814(A), this claim was preserved for appeal.

provisions enacted for the benefit of individuals may be so far waived by those for whose benefit they are enacted that they are estopped to insist upon their protection." *Id.* (quoting *Holmes v. Graves*, 83 Ariz. 174, 178, 318 P.2d 354, 357 (1957)). A statutory right may not be waived, however, "where waiver is expressly or impliedly prohibited by the plain language of the statute." *Verma*, 223 Ariz. at 157 ¶ 68, 221 P.3d at 36.

¶ 14 Whether waiver of the right to a fair market value determination under § 33–814 is expressly or impliedly prohibited is a question of statutory interpretation that we review de novo. *Haag v. Steinle*, 227 Ariz. 212, 214 ¶ 9, 255 P.3d 1016, 1018 (App.2011). To resolve it, we first look to the plain language of the statute: "If a statute's language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation." *Id.* (citing *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994)). If more than one plausible interpretation exists, however, we determine legislative intent from the statute's context, its language, subject matter and historical background, its effects and consequences, and its spirit and purpose. *See id.*

¶ 15 The legislature has expressly prohibited certain borrowers from waiving the protections of the anti-deficiency statutes when a lender forecloses residential dwellings on land 2.5 acres or less. In judicial foreclosures of a mortgage to secure "payment of the balance of the purchase price, or to secure a loan to pay all or part of the purchase price," A.R.S. § 33–729(A) expressly prohibits such waivers by stating that if the proceeds of the execution sale "are insufficient to satisfy" the debt, it *"may not otherwise be satisfied* out of other property of the judgment debtor, *notwithstanding any agreement to the contrary."* (Emphasis added.) In foreclosures under a deed of trust, § 33–814(G) similarly prohibits such waivers: "[N]o action may be maintained to recover any difference between the amount obtained by sale and the amount of the indebtedness

and any interest, costs and expenses." By abolishing deficiency actions in these contexts, the legislature prohibited these borrowers from waiving the anti-deficiency protections of the statutes.

¶ 16 Unlike the borrowers subject to the above statutes, borrowers subject to § 33–814(A) are not expressly prohibited from waiving the fair market value protection. The statutory scheme implies the same prohibition, however.[4] Under A.R.S. § 33–807, the legislature has granted the trustee the power of sale to foreclose against trust property when the trustor defaults. To govern the exercise of that power, the legislature has established a detailed statutory scheme that balances a lender's benefit of a quick extrajudicial remedy with a borrower's need for protection because the borrower is stripped of many protections in a non-judicial foreclosure. The scheme works through a transparent process that requires strict compliance. *See Patton v. First Fed. Sav. & Loan Ass'n*, 118 Ariz. 473, 477, 578 P.2d 152, 156 (1978) ("[L]enders must strictly comply with the Deed of Trust statutes, and the statutes and the Deeds of Trust must be strictly construed in favor of the borrower" because the "Deed of Trust Statutes thus strip borrowers of many of the protections available under a mortgage."). Every step of the non-judicial foreclosure process is set forth in detail, including giving notice of the trustee's sale, requesting copies of the notice, conducting or postponing the sale, placing bids, determining the winning bid, disbursing proceeds from the sale, and canceling a trustee's sale by paying the debt in full. *See e.g.*, A.R.S. §§ 33–808 to –813.

¶ 17 Section 33–814(A) furthers the scheme by protecting the borrower from inequitable deficiencies that may arise if the property is sold below market price. *See Baker v. Gardner*, 160 Ariz. 98, 101, 770 P.2d 766, 769 (1988) (stating that the statute's primary purpose is to protect the borrower from the risk of "artificial deficiencies" that may arise from

---

4. Our Court has recently held that as a matter of public policy, a borrower cannot waive the anti-deficiency protection of § 33–814(G). *Parkway Bank and Trust Co. v. Zivkovic*, 232 Ariz. 286, 290–91 ¶ 17, 304 P.3d 1109, 1113–14 (Ariz.App.

2013). Because we rule here that the statutory scheme prohibits waiver of the right to a fair market value determination, we need not consider whether public policy also prohibits such a waiver.

forced sales). Given the nature of a trustee's sale, "the statute does not contemplate that the purchase price will necessarily reflect the fair market value of the property." *Mid-First Bank v. Chase*, 230 Ariz. 366, 368 ¶ 7, 284 P.3d 877, 879 (App.2012). Because the statute's primary goal is to "prohibit a creditor from seeking a windfall by buying property at a trustee's sale for less than fair market value," *id.*, it allows the borrower to request a court determination of the property's fair market value as an offset against any deficiency following a trustee's sale. "By adopting the statutory procedure described above, it is ... clear that the legislature determined the risk of a below-market sale price belonged with the mortgagee and not the mortgagor." *In re Krohn*, 203 Ariz. 205, 212 ¶ 28, 52 P.3d 774, 781 (2002). The possibility of a reduced deficiency judgment discourages the trustee from creating an artificial deficiency by misconduct, such as refusing to mitigate or selling the property below market price and then pursuing the borrower for the full amount of the debt— the same misconduct that Loop 101 has alleged in this case.

¶ 18 Arizona's approach is consistent with the Restatement (Third) of Property (Mortgages) § 8.4 (1997). *Krohn*, 203 Ariz. at 212 ¶ 28 n. 7, 52 P.3d at 781 n. 7. The Reporter's Note to Restatement § 8.4 states that "[t]his section prohibits advance waiver of its 'fair value' protection. If such waiver were permitted, most mortgage forms would routinely incorporate waiver language and the impact of this section would be significantly weakened." Permitting advance waivers of § 33–814(A)'s fair market protection would not only contradict the legislature's carefully-crafted statutory scheme, but it would also eliminate the only protection a borrower has under the scheme to challenge an artificial deficiency. Of course, a borrower could litigate the matter, but the statutory scheme exists to avoid the monetary and temporal costs of such litigation.

¶ 19 We recognize that the legislature has expressly permitted the parties to waive the statutory scheme in two instances. Parties may agree in writing "that the provisions of the chapter shall not be applicable" when the deed of trust is "executed for a principal purpose other than or in addition to securing the performance of a contract or contracts," A.R.S. § 33–819. Parties may also expressly agree in the deed of trust to, "prohibit the recovery of any balance due after the trust property is sold pursuant to the trustee's power of sale, or the trust deed is foreclosed in the manner provided by law for the foreclosure of mortgages on real property." A.R.S. § 33–814(F). Neither exception, however, upsets the statutory scheme. In the first instance, strict compliance with the statutory scheme is unnecessary if the deed of trust's principal purpose is other than securing the payment of a loan. And in the second instance, the statutory scheme's purpose of protecting borrowers from artificial deficiencies is accomplished if the parties themselves prohibit a deficiency judgment.[5]

¶ 20 The legislative history also supports our conclusion that the fair market value determination cannot be waived. Section 33–814(A) has been in place since the adoption of the deed of trust statutes in 1971. The legislature amended § 33–814 in 1984 without substantive changes. *See* 1984 Ariz. Sess. Laws, ch. 121 (2nd Reg. Sess.). The legislature added subsection (B) in 1988, which provided for recovery against guarantors, and provided that such an action was "not subject to the time or fair market value limitations of subsection A." 1988 Ariz. Sess. Laws, ch. 22, § 1 (2nd Reg. Sess.).

¶ 21 The legislature reduced subsection (B) to a statute of limitations provision in 1989. *See* 1989 Ariz. Sess. Laws, ch. 192, § 3 (1st Reg. Sess.). It moved recovery against guarantors to subsection (C), but instead of exempting guarantors from the fair market value determination, as it had done a year earlier, the legislature required that the guarantor's liability be "determined pursuant

---

**5.** We note that A.R.S. § 12–1566(E) states that "[t]he obligation of a guarantor may be enforced without regard to this section in accordance with the terms and conditions of the contract between the lender and the guarantor," but it limits such enforcement to "an action independent of any other action or judgment," and provides that a guarantor "shall receive the same credit as the judgment debtor receives pursuant to this section or section 33–814."

to subsection A of this section and any judgment for the deficiency ... shall be reduced in accordance with subsection A of this section." *Id.* It then made these changes retroactive. *Id.*

¶ 22 In 1990, the legislature amended the statutes to its current form. 1990 Ariz. Sess. Laws, ch. 341, § 1 (2nd Reg. Sess.). The legislature amended § 33–814(A) to require the judgment debtor to make a "written application" for determining the fair market value of the real property. Consistent with the statutory scheme, the legislature added other specific procedural requirements, including a notice provision and a requirement that the court determine a fair market value after "a priority hearing upon such evidence as the court may allow." The legislature also defined "fair market value," as the "probable price, as of the date of the execution sale ... for which the real property or interest therein would sell after reasonable exposure in the market under conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably and for self-interest, and assuming that neither is under duress." § 33–814(A).

¶ 23 The legislature also amended the analogous judicial foreclosure statutes, A.R.S. §§ 33–725 and –727, to include fair market value protections:

All execution[s] upon judgments for foreclosure of a mortgage or deed of trust upon real property shall comply with section 12–1566. Any sale of real property to satisfy a judgment under this section or section 33–814 shall be a credit on the judgment in the amount of either the fair market value of the real property or the sale price of the real property at sheriff's sale, whichever is greater, in accordance with section 12–1566.

1990 Ariz. Sess. Laws, ch. 341, § 2 (2nd Reg. Sess.). In the same legislation, the legislature adopted A.R.S. § 12–1566, which applies to the "execution upon real property under a judgment" against a debtor or guarantor obtained pursuant to §§ 33–725 or 33–814. *See id.* at § 1. Under § 12–1566(C), the legislature provided a procedure similar to § 33–814(A) for determining the fair market value, including nearly identical written application, notice and hearing provisions. That subsection also states that "The court shall issue an order crediting the amount due on the judgment with the greater of the sales price or the fair market value of the real property," and gives the same definition of "fair market value" found in § 33–814(A). *Id.*

¶ 24 This history shows that the legislature expanded the fair market value protections to other areas of foreclosures and granted guarantors the same protections available to judgment debtors under § 33–814(A). *Accord Mid Kansas Fed. Sav. & Loan Ass'n of Wichita v. Dynamic Dev. Corp.*, 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991) ("While we can infer that the legislature's primary intent was to protect individual homeowners rather than commercial developers, neither the statutory text of [§ 33–814(G) ] nor legislative history evinces an intent to exclude any other type of mortgagor."). We thus hold that the statutory scheme does not permit the fair market value protection under § 33–814(A) to be waived.[6]

## II. The Trial Court's Fair Market Value Determination

¶ 25 CSA next argues that the court made several evidentiary errors in determining the property's fair market value. "In determining a property's fair market value, a trial court may adopt portions of the evidence from different witnesses," and this Court will sustain "a result anywhere be-

---

**6.** CSA also argues that the trial court erred in denying its motion for summary judgment as untimely. The trial court ruled the motion untimely because CSA filed it after the court had made its fair market value determination. Assuming for purposes of this appeal that the court erred in its timeliness ruling, the court nevertheless correctly denied the motion. CSA argued that Loop 101 and the Guarantors' waiver of their statutory right to a fair market value determination entitled them to summary judgment. Because the trial court correctly determined that the Loop 101 and the Guarantors could not waive that right, the trial court correctly denied the motion even if the motion was technically timely. We may affirm the trial court's ruling for any reason the record supports. *State v. Mabery Ranch, Co.*, 216 Ariz. 233, 244 ¶ 46 n. 10, 165 P.3d 211, 222 n. 10 (App.2007).

tween the highest and lowest estimate which may be arrived at by using the various factors appearing in the testimony in any combination which is reasonable." *State Tax Comm'n v. United Verde Extension Mining Co.*, 39 Ariz. 136, 140, 4 P.2d 395, 396 (1931). When a ruling is based on conflicting testimony, we will not disturb the court's ruling by reweighing the evidence. *See Flood Control Dist. of Maricopa Cnty. v. Hing*, 147 Ariz. 292, 299, 709 P.2d 1351, 1358 (App.1985) *overruling on other grounds recognized by City of Scottsdale v. CGP–Aberdeen, LLC*, 217 Ariz. 626, 629 ¶ 10 n. 8, 177 P.3d 1198, 1201 n. 8 (App.2008).

■■■ ¶ 26 On this record, we find no error. The trial court entered a twenty-one page minute entry ruling detailing 160 factual findings and conclusions of law to support its fair market value determination. The court recognized three methods of valuation, but adopted the comparable sales and income approach methods of valuation. After finding that the market was declining and rental incomes were down, the court considered the "comparable sales of nearby properties." The court considered "REO" sales,[7] but found that they "should not be given much weight given the expectation that the sale might be as much as 50% off from a normal selling price." The court then made detailed findings weighing each witness's testimony and the appraisal reports in evidence. The court found that appraisers valued the property as follows: Brekan: $11,115,000 ("stabilized") or $6,140,000 ("as is"); Nava: $17,000,000 ("stabilized") or $13,100,000 ("as is"); and Lyons: $16,100,000 ("stabilized") or $12,500,000 ("as is"). It also noted that Nava had appraised the value of the property at $17,000,000 ("stabilized") and $13,100,000 ("as is") several months earlier. The court concluded that the property's fair market value was $12,500,000.

■■■ ¶ 27 None of the alleged evidentiary errors calls into question the validity of the trial court's ruling. CSA first argues that the trial court improperly considered evidence of a potential lease in determining the property's fair market value because the lease arose after the trustee's sale and was thus irrelevant to determine the fair market value at the time of the sale. CSA cannot complain about the admission of the potential lease, however, because CSA itself presented the lease information to the trial court as part of the appraisal made by its expert, Brekan, and it did so over Loop 101's objection. *See Brown v. U.S. Fid. and Guar. Co.*, 194 Ariz. 85, 88 ¶ 9, 977 P.2d 807, 810 (App. 1998) (party offering evidence cannot complain of its admission). Moreover, as Loop 101 notes, the lease was relevant to evaluating the basis for Brekan's appraisal. *See Life Investors Ins. Co. of Am. v. Horizon Res. Bethany, Ltd.*, 182 Ariz. 529, 534, 898 P.2d 478, 483 (App.1995) (post-sale leasing efforts were relevant to test the expert's assumptions underlying his valuation).

■■■ ¶ 28 CSA also argues that the trial court erred in considering the Arizona State Board of Equalization's tax assessment value of the property because the valuation was inadmissible hearsay. Regardless whether the valuation was hearsay, CSA again cannot complain because its own expert referred to the Board's valuation in his appraisal. *Brown*, 194 Ariz. at 88, 977 P.2d. at 810. Moreover, because the Board's tax assessment value of $17,377,814 was much higher than the court's ultimate valuation of $12,500,000, any error was harmless.

■■■ ¶ 29 CSA further argues that the trial court erred in adopting Lyons' appraisal valuation because that appraisal improperly discounted "REO" sales. CSA has waived this argument, however, because it did not object to Lyon's appraisal on this basis. *Estate of Reinen v. N. Ariz. Orth., Ltd.*, 198 Ariz. 283, 286 ¶ 9, 9 P.3d 314, 317 (App.2000) (failure to object waives claim on appeal). Even if CSA had not waived the claim, no error occurred. Although the court's fair market valuation of $12,500,000 was the same as Lyon's appraisal value, the court did not simply adopt Lyon's appraisal value, but con-

---

7. "REO" stands for "real estate owned" properties, properties a bank or lending institution owns. *Walsh v. New West Fed. Sav. & Loan Ass'n*, 234 Cal.App.3d 1539, 1 Cal.Rptr.2d 35, 37 (1991).

sidered all of the appraisals to determine its view of the fair market value:

> Each of the valuations can be attacked or disputed to some extent.... But it is helpful to note that all of the figures are in relatively close range except that of Mr. Brekan. Mr. Brekan's "as is" estimate is less than 50% of the values of any other appraiser except for being about 60% of the Broker's original Opinion of Value. And of course, the BOV was for a relatively quick sale, less than the required "reasonable exposure in the market." This comparison detracts from Mr. Brekan's conclusions.

Moreover, CSA's criticism of Lyon's appraisal goes merely to the weight the trial court should have given it, and we will not reweigh the evidence on appeal as long as substantial evidence supports the trial court's ruling. *Sholes v. Fernando*, 228 Ariz. 455, 460 ¶ 15, 268 P.3d 1112, 1117 (App.2011). Substantial evidence supports the trial court's fair market value determination, and we will not disturb it.

¶ 30 Finally, CSA argues the trial court erroneously found that the "bank" took possession of the property because it conflated CSA with the bank. But notwithstanding that MidFirst's attorney referred to CSA and MidFirst in opening arguments as the "Bank" "for ease of reference," the court did not appear to confuse the parties. And CSA does not explain—and the record does not show—how any conflation affected the validity of the trial court's fair market value determination. CSA's argument fails. No error occurred.

### III. The Trial Judge's Recusal

¶ 31 CSA argues that the second judge should have granted its motion to vacate the ruling that Loop 101 and the Guarantors had not waived the fair market value hearing and the resulting determination because of the original judge's recusal. CSA admits that it never knew the reason for the recusal, but argues that the recusal itself tainted the rulings with the appearance of impropriety. The second judge believed that the recusal was related to the original judge's pending retirement. "A judge may on his own motion, if he acts timely, recuse himself even though the reason given might not be sufficient to form the basis of a legal disqualification." *Zuniga v. Superior Court (Bernstein)*, 77 Ariz. 222, 224, 269 P.2d 720, 721 (1954); *see also Scheehle v. Justices of the Supreme Court of Arizona*, 211 Ariz. 282, 300, 120 P.3d 1092, 1110 (2005) (stating that a judge may recuse himself from judicial duties "even when the canons do not require recusal.") The second judge thus correctly denied CSA's motion to vacate.

### CONCLUSION

¶ 32 For these reasons, we affirm the judgment. Because Loop 101 and the Guarantors have prevailed on this appeal, we award them their costs on appeal and attorneys' fees pursuant to A.R.S. § 12–341 and –341.01 upon their compliance with Arizona Rule of Civil Appellate Procedure 21, and we deny CSA's request for costs and attorneys' fees.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge and ANDREW W. GOULD, Judge.