NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

LAUGHLIN LAND, LLC, an Arizona limited liability company,
*Plaintiff/Appellee,*

*v.*

DAVID W. LORDS, *Defendant/Appellant.*

No. 1 CA-CV 14-0193
FILED 7-7-2015

Appeal from the Superior Court in Mohave County
No. S8015CV20080624
The Honorable Lee Frank Jantzen, Judge

**AFFIRMED**

COUNSEL

Premier Legal Group, Las Vegas
By Andrew H. Pastwick
*Counsel for Plaintiff/Appellee*

Dessaules Law Group, Phoenix
By Jonathan A. Dessaules, Douglas C. Wigley
*Counsel for Defendant/Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Andrew W. Gould and Judge Peter B. Swann joined.

_____

**H O W E**, Judge:

¶1        David W. Lords appeals the trial court's orders (1) allowing Laughlin Land, LLC, ("Laughlin") to substitute for Consolidated Mortgage, LLC, now known as CM Capital services, LLC, ("CM") in the underlying deficiency action and (2) concluding that he owed a deficiency judgment based on the court's findings of the property's fair market value as $18 million and the amount owed as $22,411,605.88. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        In 2006, CM, a mortgage broker, packaged a $17,250,000 loan for a pool of private investors ("the loan"). Each investor signed a "loan servicing agreement" and "special power of attorney" agreement naming CM as the investor's attorney-in-fact for purposes of servicing the loan. As relevant here, the servicing agreements provided that if the borrower defaulted on the loan, CM would "attempt to collect the payment by, among other things, . . . taking foreclosure steps, and obtaining legal representation for the Lender in litigation and bankruptcy proceedings." If CM pursued foreclosure proceedings, it could enter a credit bid "for the Property securing such Loan on behalf of the Lender." Further, if CM purchased the property on behalf of the lenders by credit bid, then CM could create a "Special Purpose Entity" ("SPE") "for the purpose of taking such title." The SPE "shall be owned by all of the Lenders on the Loan, with each Lender owning a fractional interest in proportion to that Lender's Fractional Interest in the Loan."

¶3        In June 2006, L.U.R.E. I, LLC, ("LURE") executed a promissory note and first deed of trust for the loan in favor of "Consolidated Mortgage L.L.C. FBO See Exhibit 'A.'" "FBO" means "for the benefit of." Lords executed a commercial guaranty for the repayment of the loan, plus interest, costs, fees, and charges also to "Consolidated Mortgage L.L.C. FBO See Exhibit 'A.'" As relevant here, the guaranty contract provided that Lords "absolutely and unconditionally guarantee[d] full and

punctual payment and satisfaction of the Indebtedness of [LURE] to [CM FBO See Exhibit 'A']." "Indebtedness" included the principal amount outstanding at any one or more times and accrued unpaid interests:

> [A]ll of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interests thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that [LURE] individually and collectively or interchangeably with others, owes or will owe [CM FBO See Exhibit "A"] under the Note and Related Documents and any renewals, extensions, modifications, refinancing, consolidations and substitutions of the Note and Related Documents.

The contract further provided that it would take effect and "continue in full force until all Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full."

¶4 Moreover, Lords "agree[d] to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty." "Costs and expenses include Lenders' attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings . . . and any anticipated post-judgment collection services." Lords further "waive[d] any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to . . . any disability or other defense of [LURE] . . . or by reason of the cessation of [LURE's] liability from any cause whatsoever, other than payment in full legal tender, of the indebtedness[.]" The note, guaranty contract, and deed of trust all included the same "Exhibit A," which was a list of the pool of private investors. The loan was a purchase money loan for a 640-acre parcel ("the property").

¶5 LURE defaulted on the note and subsequently filed for Chapter 11 bankruptcy protection. In its bankruptcy petition, LURE listed CM as having an unliquidated $17,250,000 secured claim. Pursuant to the servicing agreements, CM retained counsel to represent the investors' interests in the bankruptcy proceedings. CM also commenced foreclosure proceedings on the property. Before the trustee's sale, however, CM created an SPE, Laughlin, on January 2, 2008.

¶6        Laughlin's operating agreement provided that its manager was CM and members were "lenders set forth at Exhibit 'A.'" "Exhibit A" was the list of the pool of private investors as included in the note, guaranty, and deed of trust. Laughlin's purpose was to hold "title to real property obtained through foreclosure proceedings and [authorize] [CM] to manage, operate, improve, rent and sell such real property." The agreement further elaborated on the relationship between CM, Laughlin, LURE, the loan, and the property: "WHEREAS, the third-party borrower [LURE] defaulted on the Loan and, pursuant to the terms of the Loan Servicing Agreement, LAUGHLIN LAND, LLC, was formed by [CM] and has obtained title to the Property through foreclosure proceedings[.]"

¶7        At the trustee's sale on January 18, 2008, CM made a credit bid of $10 million. Soon after, CM filed a proof of claim in LURE's bankruptcy proceedings, which stated, "On or about June 7, 2006, Debtor LURE I, LLC ('Debtor') executed a promissory note ('Note') in favor of Consolidated Mortgage, LLC for the benefit of its investors. . . . The principal amount of the Note was $17,250,000." The proof of claim also stated that the "outstanding principal balance and interest of the Note owed by [LURE] on July 13, 2007, the date [LURE] filed its Chapter 11 bankruptcy petition . . . , was $18,414,375," the sum of the principal balance ($17,250,000) and "interest from 02/01/2007 to 07/13/2007 ($1,164,375)." The incorporated exhibit stated that the payoff amount also included "interest from 7/14/2007 at $7,187.50 per day" to the date CM received payment.

¶8        On June 2, 2008, the trustee issued a recorded trustee's deed for the property to "Consolidated Mortgage, LLC, FBO" and listing the private investors, along with Exhibit "A." Two days later, the investors, identified as "Exhibit A," quitclaimed to Laughlin all their "right, title and interest in and to the property." The accompanying affidavit of property value provided that "Consolidated Mortgage, LLC as Attorney in Fact FBO Private Investors" sold to "Laughlin Land, LLC," the property for $10 million. The affidavit also stated that the relationship between CM and Laughlin as: "Transfer into a newly formed LLC."

¶9        Within 90 days of the trustee's sale, CM, as "attorney-in-fact and servicing agent for private investors," filed suit against Lords under A.R.S. § 33–814(A) to recover the alleged loan deficiency plus fees and costs. In 2009, CM moved for partial summary judgment on whether a contract existed between Lords and CM. The trial court granted the motion "on the issue that there [was] in fact a contract; that there [was] in fact, a failure to perform on that contract or a breach of the contract." But the court left open the issue of damages, if any existed.

¶10            In 2011, CM resigned as attorney-in-fact and manager of Laughlin and was replaced by Laughlin Investors, LLC, an entity with 50.03% ownership interest in Laughlin. The members of Laughlin, that is, the private investors, then sought substitution in as plaintiffs in the underlying deficiency action against Lords. The motion stated that CM was not a member of Laughlin, it was not entitled to any damages that may be awarded in the suit, and Laughlin was the real party in interest. After oral arguments, the trial court granted the motion, and Laughlin filed an amended complaint substituting itself for CM.

¶11            Lords moved to dismiss the amended complaint and for summary judgment, arguing that Laughlin was not the proper plaintiff, but the trial court denied both motions. After a bench trial, the court concluded that the property's fair market value on January 18, 2008, was $18 million, the amount owed on that date was $22,411,605.88,[1] and hence, the deficiency was $4,411,605.88. The court also awarded Laughlin attorneys' fees and costs. Lords moved for a new trial, but the court denied it. Although Lords appealed before the court entered a final judgment on its denial of his motion for a new trial, the appeal was reinstated after that judgment was finalized.

## DISCUSSION

¶12            As relevant to our resolution of this appeal, Lords argues that the trial court erred by allowing Laughlin to substitute for CM in the deficiency action and in determining the property's fair market value, the amount Lords owed, and the deficiency.[2] For the reasons discussed below,

---

[1]      The amount owed was the sum of the principal balance; the amount of interest, including February 2007 interest, March 2007 interest for 7 days at $6,028.22 per day at 13%, March 2007 interest for 24 days at $6,955.65 per day at 15%, April through December 2007 interest at $215,625 per month (15%), and January 2008 for 18 days at $6,955.65 per day; and fees and costs, including written demand for payoff, trustee fee, default fee, foreclosure fees, past maturity fee for March, June, and September 2007, and past maturity fee for December 2007 prorated.

[2]      Lords also appeals the trial court's orders awarding Laughlin attorneys' fees and costs and denying his motions to dismiss, for summary judgment, and for a new trial. But Lords has waived these issues because he presented no arguments about them on appeal. *See* Ariz. R. Civ. App. P. 13(a)(6) (providing that the opening brief "must set forth" an argument,

the trial court did not err in allowing the substitution or in determining the fair market value, amount owed, or deficiency.

## 1. Substitution of Laughlin for CM

**¶13** Lords argues that the trial court erred by allowing Laughlin to substitute for CM in the deficiency action pursuant to Arizona Rule of Civil Procedure 17(a). We interpret Rule 17(a), the real party in interest rule, in conjunction with the law of standing. *Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 406 ¶ 8, 207 P.3d 654, 659 (App. 2008). In Arizona, a party has standing to sue "if, under all circumstances, the party possesses an interest in the outcome of the litigation." *Id.* (citation omitted). We review de novo whether a party has standing, *In re Indenture of Trust Dated Jan. 13, 1964*, 235 Ariz. 40, 44 ¶ 5, 326 P.3d 307, 311 (App. 2014), and the meaning and effect of a procedural rule, *Preston v. Kindred Hosps., L.L.C.*, 225 Ariz. 223, 225 ¶ 8, 236 P.3d 450, 452 (App. 2010).

**¶14** Arizona Rule of Civil Procedure 17(a) provides in pertinent part that "[e]very action shall be prosecuted in the name of the real party in interest." "No action shall be dismissed on the ground that it was not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for . . . substitution of[] the real party in interest." Ariz. R. Civ. P. 17(a). Rule 17(a) allows for substitution of the real party in interest as the plaintiff to avoid dismissal of an ordinary civil action. Further, a party "with whom or in whose name a contract has been made for the benefit of another" "may sue in that person's own name without joining the party for whose benefit the action is brought." Ariz. R. Civ. P. 17(a).

**¶15** Here, the trial court properly allowed Laughlin to substitute for CM because both were representatives of the real party in interest, the private investors listed in Exhibit "A." The record shows that within 90 days of the trustee's sale, CM, acting as attorney-in-fact and servicing agent for the private investors, filed suit against Lords for a deficiency judgment

---

which "must contain . . . contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies"); *State v. Felkins*, 156 Ariz. 37, 38 n.1, 749 P.2d 946, 947 n.1 (App. 1988) (claim abandoned when not supported by sufficient authority). Regardless of the waiver, because Lords' arguments to the trial court asserted no considerations mandating a review of the denials of his motions, we decline to do so.

for the benefit of the investors. Further, CM entered into the underlying note, guaranty, and deed of trust for the benefit of the investors; CM was merely their agent. As CM conceded throughout the proceedings, it had no ownership interest in the property or interest in the litigation and was acting solely for the benefit of the investors. Thus, when CM resigned as the investors' agent, the investors accordingly moved under Rule 17(a) to substitute CM with Laughlin, another agent, to continue to pursue their deficiency action against Lords. Finally, the rule's purpose was served here because the record shows that Lords was able to present the same evidence and maintain the same defenses that he had against CM, which in effect was the private investors. *See Colorado Cas. Ins. Co. v. Safety Control Co., Inc.*, 230 Ariz. 560, 565 ¶ 11, 288 P.3d 764, 769 (App. 2012) ("The purpose of [Rule 17(a)] is to enable the defendant to avail himself of the evidence and defenses that he has against the real party in interest. . . .") (internal quotation marks and citation omitted).

¶16     But Lords counters that a deficiency action is a claim for breach of contract, and because Laughlin was not a party to the note or guaranty, Laughlin must first prove that it was either a third-party beneficiary or assignee of the documents to enforce them against Lords. But Arizona's non-judicial foreclosure statutes do not require a purported note holder to possess the original negotiable instrument in order to enforce it. *See* A.R.S. § 33–807(A) ("A power of sale is conferred upon the trustee of a trust deed under which the trust property may be sold . . . after a breach of default. . . ."). That is, Laughlin need not present the note or guaranty in order to pursue the deficiency action, *see Hogan v. Washington Mut. Bank, N.A.*, 230 Ariz. 584, 587 ¶¶ 11–12, 277 P.3d 781, 784 (2012) (allowing a trustee to proceed with a non-judicial foreclosure without first requiring the beneficiary to prove ownership of the underlying note), especially because Laughlin was enforcing the action as an agent and for the benefit of the private investors, whose names and fractional interests are listed in the note, guaranty, deed of trust, and all other relevant documents.

¶17     Lords further counters that even if the substitution was valid, Laughlin's claim cannot relate back because Laughlin did not exist when CM filed the action. The gist of Lords' argument is that Laughlin's claim is untimely because it failed to file the action within the 90-day timeline as prescribed in A.R.S. § 33–814(A). But when an agent of the real party in interest is substituted for an original plaintiff that was also an agent of the real party in interest with identical claims, Rule 17(a) provides that the "substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." Ariz. R. Civ. P. 17(a); *see also Preston v. Kindred Hosps. W. L.L.C.*, 226 Ariz. 391, 393–94 ¶ 12, 249

P.3d 771, 773–74 (2011). Consequently, because Rule 17(a) allows Laughlin to substitute for CM and for relation back of the claim, the trial court did not err.

## 2. The Deficiency Judgment

### 2a. The Fair Market Value

**¶18**        Lords next argues that the trial court erred in determining the property's fair market value. A deficiency judgment is "the sum of the total amount owed the beneficiary as of the date of the sale . . . less the fair market value of the trust property on the date of the sale . . . or the sale price at the trustee's sale, whichever is higher." A.R.S. § 33–814(A). "In determining a property's fair market value, a trial court may adopt portions of the evidence from different witnesses, and this Court will sustain a result anywhere between the highest and lowest estimate which may be arrived at by using the various factors appearing in the testimony in any combination which is reasonable." *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 233 Ariz. 355, 362–63 ¶ 25, 312 P.3d 1121, 1128–29 (App. 2013) (internal quotation marks and citation omitted). "When a ruling is based on conflicting testimony, we will not disturb the court's ruling by reweighing the evidence." *Id.*

**¶19**        Here, the trial court did not err in determining that the property's fair market value was $18 million. In reaching its decision, the court explained that based on the evidence, the ranch where the property was located was "burgeoning, growing, expanding" and "that speculation was high obviously from 2002 to 2007." The property's appraisal in 2005 was $30 million and in August 2007 was $19.2 million. In fall 2007, the market value at the ranch was going down, and accordingly, the property's value could not be the same as two years earlier at $30 million or as the bankruptcy value of $27 million or as high as the appraisal in August 2007. Ultimately, the court found the property's value in January 2008, on the date of the trustee's sale, as $18 million, a result between Lords' appraised value, $20,900,000, and Laughlin's appraised value, $12,800,000. Because the trial court used various factors appearing in testimony in a reasonable combination to reach its fair market value determination and because the result was between the highest and lowest estimates, the court did not err.

### 2b. The Amount Owed

**¶20**        Lords next argues that the trial court erred in determining the amount owed. He contends that under the guaranty contract, his obligation is capped at $18,414,375, without any post-petition accrual of interest and

fees, because the contract provided that his liability is "coexistent with LURE [sic] (*i.e.*, the amount that LURE 'owes or will owe')." We review de novo contract and statutory interpretation issues. *Tenet Healthsystem TGH, Inc. v. Silver*, 203 Ariz. 217, 219 ¶ 5, 52 P.3d 786, 788 (App. 2002). The nature and extent of a guarantor's liability depends on the terms of the guaranty contract. *First Credit Union v. Courtney*, 233 Ariz. 105, 108 ¶ 12, 309 P.3d 929, 932 (App. 2013). Although we generally construe a guaranty to limit a guarantor's liability, we must give effect to its clear and unambiguous terms. *Tenet*, 203 Ariz. at 220 ¶ 7, 52 P.3d at 789.

¶21 Here, the terms of the guaranty contract are clear that Lords' potential liability is greater than LURE's potential liability. Under the contract, Lords agreed to pay all of LURE's indebtedness, which broadly defined included all (1) principal amount outstanding at any one or more times; (2) accrued unpaid interest thereon; and (3) collection costs and legal expenses related to the debt, liabilities, and obligations, until LURE's indebtedness was paid in full and Lords' other obligations under the contract was performed in full. Additionally—and beyond LURE's "indebtedness"—Lords agreed to pay (4) all Lenders' costs and expenses, including attorneys' fees and legal expenses incurred in connection with enforcing the contract, bankruptcy proceedings, and any post-judgment collection services. Thus, contrary to Lords' contention, the contract provided for greater liability for Lords than LURE. *See Arizona Bank & Trust v. James R. Barrons Trust*, 713 Ariz. Adv. Rep. 25, 4 ¶ 14 (May 28, 2015) (providing that a guaranty contract may provide for greater liability than that of the principal debtor); *Provident Nat'l Assurance Co. v. Sbrocca*, 180 Ariz. 464, 466, 885 P.2d 152, 154 (App. 1994) (concluding that guarantors of a nonrecourse loan could be held liable to a lender based on their agreement to unconditionally guarantee what would otherwise be a nonrecourse promissory note).

¶22 Moreover, under the contract, Lords waived cessation of LURE's liability from "any cause whatsoever, other than payment in full legal tender, of the indebtedness" as a defense; Lords' liability continued despite LURE's bankruptcy. The record indicates that neither Lords nor LURE paid any part of LURE's indebtedness on the date of the trustee's sale. Accordingly, Lords as guarantor owed LURE's indebtedness as defined by the terms of the guaranty contract to Laughlin. The record shows that on the date of the trustee's sale, Lords owed $22,411,605.88, the sum of the unpaid principal, amount of interest accrued before the payoff date, amount of interest accrued after the payoff date at the default rate, and various fees and costs. The amount owed minus the fair market value is

$4,411,605.88, and consequently, the trial court did not err in determining the three amounts.

### 3. Attorneys' Fees and Costs

¶23      Both Laughlin and Lords request awards of attorneys' fees and costs pursuant to A.R.S. §§ 12–341 and –341.01 and the guaranty contract. Because Laughlin is the successful party, we grant its request, but deny Lords' request.

### CONCLUSION

¶24      For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama